JOSEPH J. HALSEY ET AL. v. LEHIGH VALLEY RAILROAD COMPANY.

1. On a rule to show cause a verdict cannot be sustained on legal theories antagonistic to those on which it was rendered.

2. If the Morris Canal and Banking Company, by permanent structures or otherwise, occasionally draws water from a river, but does not intend to appropriate any right to draw such water in pursuance of its chartered powers, a mill-owner, whose water rights are infringed by the diversion, may maintain an ordinary common law action on the case for damages occasioned thereby.

3. If the canal company claims to have appropriated the right to divert water for the purposes of its canal, it must show that the former owner of the water right has received either actual or constructive notice of the appropriation.

4. If the company's acts are relied on as showing the appropriation of such a right to divert, they must amount to a clear invasion of the rights of the former owner, and must afford as certain and definite

information with respect to the subject appropriated as a formal notice would give.

5. A declaration made by the president of the canal company about the time of the construction under his direction of a certain work for the use of the canal, with regard to the purpose of the company in building it, is competent evidence against the company.

6. A declaration respecting the management of a section of the canal, made by the supervisor of that section in response to a complaint concerning his management, is competent evidence against the company.

7. The owner of a mill on the Rockaway river let the mill to tenants from year to year. The canal company, by its permanent structures, so constantly abstracted the waters of the river above the mill as to impair the value of the property, and to compel the landlord to reduce his rents. *Held*, that the landlord could recover damages for the injury to his property, and that the tenant could also recover damages for the diminution in the value of the use of the mill resulting from abstractions of the water during his term.

---

In case. On rule to show cause.

Argued at November Term, 1882, before BEASLEY, CHIEF JUSTICE, and Justices KNAPP and DIXON.

For the plaintiffs, *H. C. Pitney.*

For the defendant, *T. N. McCarter* and *T. Little.*

The opinion of the court was delivered by

DIXON, J. Seven suits were brought by the plaintiffs, owners and occupants of a grist mill, a saw mill and a forge upon the Rockaway river, to recover from the defendant damages for injuries caused by the diversion of water out of the river above the plaintiffs' works into the Morris canal. The period covered by the suits is from April, 1872, to May, 1880, during which the canal was operated by the defendant under a lease from the Morris Canal and Banking Company executed in May, 1871. By consent the causes were all tried together at the Morris Circuit, where verdicts were obtained for the plaintiffs. These verdicts the defendant is now seeking to have set aside.

The principal defence interposed at the trial was that the alleged diversion was the necessary effect of works constructed by the canal company in deepening and widening the canal, between the years 1845 and 1860, and that, by the construction and use of those works, the canal company took and appropriated *the right* to make such diversion before leasing to the defendant, and hence the plaintiffs' remedies are only by action against the canal company under its charter to recover compensation once for all. The main topic of the defendant's complaint here is the mode in which that defence was treated at the trial.

The plaintiffs meet the defence *in limine*, by insisting that the canal company's power of eminent domain was exhausted before 1845, both by a legal limitation fixed in the charter, and by the fact that the power had been then once fully exercised by the complete construction of the canal. But it will not avail the plaintiffs now for us to examine this contention, since, if we should reach the conclusion to which they would persuade us, we could not, on that ground, maintain the verdicts, because an opposite view was adopted at the trial, and it is not proper, on rules to show cause, to uphold verdicts on legal theories antagonistic to those upon which they were rendered. *Hays* v. *Pennsylvania R. R. Co.*, 13 *Vroom* 446; *Marts* v. *Cumberland Mut. Fire Ins. Co.*, 15 *Vroom* 478.

It is, therefore, necessary to determine whether, in the law as laid down at the Circuit, or in the findings of the jury thereupon, the defendant has just cause of complaint.

The trial judge is said to have erred in charging the jury as follows: "An appropriation of the right to the use of the water could only be made when it was intended and designed to be made by the company. The mere use of waters at irregular times and without a settled plan, if not intended to be an appropriation, would not deprive the owner below of his right of property. There must be something of permanency in the right claimed and the use under it. But we must here avoid the error of considering that the element of permanency must attach absolutely to the use. The contrary

is expressly provided by the charter.    *    *    *    It is impossible to contend that the use of the water must be permanent in the sense of its being constant or continuous.  But the permanency must exist in the right to use appropriated by the company.  The company must intend and design to take a right to use and to appropriate that right constantly and forever; thereafter it may use what it finds necessary."

The objection urged against this portion of the charge is that whether there was such an appropriation in 1845–1860 as put the mill-owner to his action for compensation once for all, is made to depend on the intention and settled plan of the company, rather than on the fact that the works actually built would naturally and reasonably require at times the taking of the water for their proper operation.

But we think the learned judge did no wrong to the de-, fendant in these instructions.  The rights of the mill-owner were directly affected, not by the construction of the works of the canal company, but by the actual diversion of the water in operating those works.  This diversion, to the point of injury, was confessedly not constant, but occasional, depending on both the extent of the water supply from other sources and the magnitude of the company's business.  It was even claimed that, by means of certain contrivances of the canal company, water not naturally flowing into the Rockaway river was brought into it above the plaintiffs' property, in quantity as great as that abstracted, so that for many years after the change in 1845–1860 there was in fact no diminution of the plaintiffs' supply.  Under these circumstances there is nothing unjust in holding that if the canal company did not intend to appropriate the right to use the water to the detriment of the mill-owner, and the mill-owner does not claim that it did make such appropriation, then the right has not been acquired, but the company stands in the position which it designed to occupy, of being liable for each occasional abstraction.  The company's charter was not framed to compel the company to take property which neither it nor the owner wished to have taken, simply because its

works were so constructed as to be capable of taking the same, either constantly or occasionally, according to the method of their management. This is not only in accord with but almost necessarily inferable from the language of the Court of Errors in *Lehigh Valley R. R. Co.* v. *McFarlan*, 14 *Vroom* 605, 610, where, in distinguishing between the grounds of an ordinary suit for damages and those of the statutory action for value, it is said : " If the injury be one that in its nature is temporary and recurrent, such as might arise from the company's negligence in allowing its works to be out of repair, or from the temporary diversion or throwing back of water, arising from the irregular supply of water from extraneous sources, or the management of the gates of the canal locks, or from the occasional use of flash boards as a temporary expedient, successive actions for the damages sustained from time to time may, under the circumstances, be the appropriate remedy. But when the company has effected a complete appropriation of property by the location of its canal on lands, or the appropriation of water rights to its use by the construction of works designed to effect a constant and continuous diversion or flooding back of waters, such lands and water rights are taken, and the damages consist in the entire value of the property taken." Certainly this indicates that, if the works are not designed by the company to effect a constant and continuous diversion, and the injurious diversion is in fact only occasional, then the private owner is not excluded from his common law remedy. Such was the condition of things to which the jury were directed to apply the doctrine in question.

The defendant also complains of the following instructions to the jury : " Such an intention or design [to appropriate a right to divert water] must be in some mode sufficiently open and notorious to give actual or constructive notice to the owner of the intention to take and of the amount intended to be taken. If the company applied for commissioners, it is the express requirement of the charter. If it neglects to do so, then the clear implication from the fact that an action for

compensation is given to the owner is that there must be such
fair notice to the owner as will enable him to know what has
been taken from him, so that he may intelligently claim his
redress by compensation.  But the extent and character of the
appropriation may also be inferred from the acts and conduct
of the company.  Those acts may give notice to the parties
interested, and if the plan and scheme of the company in
forming its artificial navigation, as practically developed in
its construction on the ground, is such as to justify the infer-
ence that thereby it needed and intended to acquire a right to
divert waters, and a certain portion thereof, less or more, a
part or the whole, if necessary, then such notice to the owners
and such an appropriation would be inferred.

" Now, in considering this question, namely, what extent of
appropriation was intended and acquired, a jury, impaneled
to award compensation in an action by the owner therefor,
would have a right to look at the acts, conduct and declara-
tions of the company.  They would have a right especially
to examine the plan as indicated by the works constructed.
If from all the acts it appeared to such a jury that a reasona-
ble use of the plan as a whole required at times the whole of
the waters of a stream which the plan contemplated using,
the clear inference would be that the company intended to
take and appropriate the right to divert the whole when the
necessity therefor existed.  If less than the whole would
answer the reasonable use of the plan, then the inference that
less than the whole was appropriated would be drawn.

" In like manner, in determining what appropriation,
if any, was made by the company, you should look at its
intention as manifested by its acts and conduct and declara-
tions, and the plan and scheme adopted by it.  If from
all you infer that the company intended to appropriate a
right to divert any of the waters in question in these cases,
and the plan was such and so open and notorious as to give
the land-owners fair notice of the intention and appropriation,
then an appropriation by the company must be found by you

to have been effected to an extent commensurate with the intention thus inferred."

The point of objection here is that actual or constructive notice of the appropriation is declared to be necessary in order to confine the mill-owner to an action for the value of the property taken. The defendant claims that, in contemplation of law, the right to divert water is at once acquired by the erection of permanent structures capable of effecting such diversion, and that this right is commensurate with the control which the company may be able to exercise over the water by these structures; and that, as soon as the right is so appropriated, the statutory remedy arises, to the exclusion of all others, regardless of notice to the former proprietor.

In the light of the matters now before us, it is manifest that this claim is an exceedingly broad one. The canal was enlarged in sections, the work occupying a period of about fifteen years, from 1845 to 1860. At some time during this interval, the capacity of the canal became such that it was practicable to use in its management all the waters of the Rockaway river, and the company's dam and gates at the intersection of the canal and river were of a character to enable the company to turn substantially all the river water into the canal. But in fact no such diversion was at any time made. So great were the other sources of supply, that several days were spent at the trial in endeavoring to ascertain by testimony whether during this whole period, and for ten years thereafter, the canal company occasioned any appreciable diminution in the flow at the plaintiffs' mill. Now, if, in truth, the company, by its permanent structures, had created the power of controlling the entire waters of the stream as early as 1850, then, according to this claim, the plaintiffs would have lost their whole mill privilege without compensation, by mere lapse of time, although it needed days upon days of examination to determine whether in fact they had at all been disturbed in its enjoyment, and although they had no notice, actual or constructive, that any one had taken it away from them. I cannot see how such a claim is de-

Halsey v. Lehigh Valley R. R. Co.

fensible.   Notice to the proprietor must be a prerequisite or concomitant of the exercise of eminent domain by the company.   If it be not actual, then circumstances must be shown which would have apprised a reasonably prudent man of the fact and the extent of appropriation.   Nor is any laches to be imputed to an owner because he has not acquired knowledge of the existence of structures along the route of the canal, which have in no way affected his property.   If the company's acts are to be relied on as showing that private property has been taken, they must amount to a clear invasion of that property, and must afford as certain and definite information with respect to the subject appropriated as a formal notice would give.   Less than this would fail of securing just protection to private rights against the extraordinary powers which the company's charter conferred.   Certainly the rule laid down at the Circuit was not too liberal to the mill-owner.

The defendant also presents the following reason for a new trial :   " The court erred in charging the jury that if it appears from the acts of the company that the plan adopted by the company contemplated and intended that Lake Hopatcong should be the primary source of supply, and that plan continued without change, then that fact ought to be considered by them with reference to the proof of appropriation of other waters, and it might affect their judgment as to the extent of that appropriation ; that is, as to, first, whether there was any appropriation, and, second, as to whether the appropriation in that event was not of the waters only as a secondary source of supply, to be resorted to after the exhaustion of the other source, in which case then it must appear that Lake Hopatcong was either exhausted or insufficient for the reasonable use of the canal before this could be resorted to."

Counsel's criticism upon that charge is that there was not a syllable of evidence to be found in the case that would justify the jury in finding that the canal company had adopted a plan which shut them up to the Lake Hopatcong as their primary source of supply, and which did not permit them to

take the Rockaway river until after Lake Hopatcong was exhausted.

But Lake Hopatcong is expressly mentioned in the company's charter as a source of water supply to the canal, and it is conceded to be the most reliable source. The right to use its waters had been acquired before 1845, and in various reports of the chief officers of the company, both during and after the enlargement of 1845–1860, this lake is referred to in terms which indicate that it was regarded as the main reservoir of water for the canal. It would therefore be not an unreasonable inference that in determining whether additional water rights should be purchased, the company would bear in mind the supply which this lake might afford. If this inference were drawn by the jury, then it should be considered by them with reference to the proof of appropriation of other waters, and the extent of such appropriation. Such is the aspect in which it was presented by the charge.

Objection is also made to the admission in evidence of a letter written October 19th, 1863, by Ephriam Marsh, then president of the canal company, to Henry McFarlan. The latter was the owner of a foundry on the Rockaway river below the point at which it was contended the company had appropriated the right to take the waters of the river. At the date of the letter, the company was constructing, or had just completed, an underground passage by which it was possible to draw the river water into the canal. Thereupon complaint was made by McFarlan to the president, and this letter is the reply, stating in effect that the purpose of the company in making the passage was not to divert water from the river, but to lead it from a higher to a lower section of the canal. As we have seen, the intention of the company had an important bearing on the question of the appropriation of water rights. If the company was constructing the passage with the design of using it simply to transfer water from one level of the canal to another, then its construction was not indicative of any appropriation of additional water privileges. It was certainly within the scope of the president's authority to build

such an appliance for the purpose stated, and there being no evidence to the contrary it is to be presumed that this was built under his sanction as the chief executive officer of the company.    Hence his cotemporaneous declarations as to the object of the construction are evidence against the company, tending to show that no appropriation was then made    They were part of the *res gestæ*.    *Runk* v. *Ten Eyck*, 4 *Zab.* 756; *Ins. Co.* v. *Woodruff*, 2 *Dutcher* 541; *Morse* v. *Conn. R. R. Co.*, 6 . *Gray* 450; *Kirstall Brewery Co.* v. *Furness R. R. Co.*, *L. R.*, 9 *Q. B.* 468.

The same authorities justify the admission in evidence of the declaration of Hixson, who had charge of the practical operations of the canal where the plaintiffs say their water was wrongly abstracted.    Two of the plaintiffs complained to him of the abstraction.    If the complaint was well founded, he was the officer under whose management the diversion was effected, and whose duty it was to remedy the wrong.    What he said on receiving the complaint, with reference to it, was therefore legitimate evidence against the defendant.

These comprise the objections urged against the conduct of the learned judge touching the defence presented at the trial. In our opinion they are all unfounded.

But the defendant further contends that under the evidence and the law, the jury were not warranted in finding against their defence.    It is not necessary to enter upon a discussion of the testimony taken in such volume at the trial to prove and disprove the defendant's position.    The testimony was explained at length by counsel in óral argument, and has since been carefully perused in the book, and I am sure not much is hazarded by the assertion that if the facts relied on to show appropriation at any given time had been then submitted to half a dozen intelligent persons, separately, they would not have been unanimous in the belief that any water privilege of the plaintiffs had been permanently appropriated to the uses of the canal, and no two of them would have agreed in defining the extent of such appropriation as they found.    So various and indefinite are the conclusions on this subject which might

reasonably be drawn from the appearances of things at any stated period, that I think it would not have been beyond the pale of judicial discretion if the jury had been instructed that in view of the uncertain character of the company's acts no appropriation had been made. Certainly the finding of the jury against the appropriation cannot be disturbed.

We think also that the finding of wrongful abstractions during the periods embraced in the declarations have adequate support in the proofs.

The only remaining subject of complaint relates to the damages.

Some of the landlords' suits covered years during which the premises were held by yearly tenants at money rents, which years were also covered by suits of the tenants. The landlords claimed that the diversion by the defendant had depreciated the value of the property, and consequently their rents, and for this they sought remuneration. The judge charged that in order to give a right of action to the landlords, the act inflicting the injury must have been such as tended to diminish the value of the reversion; that it must have been, to a certain extent, of a permanent nature, such as not only did present damage, but, if not interfered with or removed, would, in the ordinary course of things, continue to the end of the term, and so injure the reversion; and that wrongful diversion of the stream, not merely casual, but effected by the permanent structures of the canal, might be regarded as of this character; and that if, in the opinion of the jury, they did impair the value of the reversion, and in consequence thereof the landlords suffered a reduction in their rents, they should be compensated therefor.

These instructions are unexceptionable. The principles enunciated are laid down, and the cases are largely discussed in *Potts* v. *Clarke, Spenc.* 536 ; *Beavers* v. *Trimmer,* 1 *Dutcher* 97 ; *Tinsman* v. *B. D. R. R. Co.,* 1 *Dutcher* 255. The defendant does not complain of them ; but its counsel insists that, as a corollary to these instructions, the court should have charged that, in case the jury believed that the landlords and

tenants from year to year adjusted the rent with reference to a continued apprehended injury arising from the failure of water by reason of defendant's diversion, then the tenants were not damnified by the continuance of such injury, and cannot recover for it.   In support of this proposition, counsel relied upon *Baker* v. *Sanderson*, 3 *Pick*. 348, where the landlord was suing for the obstruction of his mill by backwater, and alleged that in consequence of the obstruction he had reduced his rents at the request of his tenants, they threatening to quit unless he would agree to a fair reduction, that he did so agree, and the tenants were satisfied with the reduction made.   Wilde, J., said that this agreement and the plaintiff's recovery in the case would be a good bar to any action in the name of the tenants.

At the trial below, the learned judge refused to charge as above indicated, upon the ground that the evidence would not justify the jury in inferring any adjustment of the rent in the sense of its being a satisfaction of the damages which the tenant might suffer from the diversion.   In this we think he was correct.   And we also think that the doctrine contended for is unsound.   By the letting the tenants acquired the right to the enjoyment of the property unimpaired by any wrongful acts of the defendant.   That, through fear of such acts, they had been enabled to obtain that right at a diminished price, neither licensed the acts nor relieved the defendants in any degree from the duty of reparation.   The measure of the tenants' damages did not depend upon the amount of rent which they paid, but upon the diminution in the value of the use of the premises resulting from the wrongful diversion of water.   The landlords, in leasing to the tenants at reduced rates, were not to be regarded as agents of the defendant adjusting with the tenants the compensation for the injury to be done.   Both landlords and tenants were acting independently of the defendant, and not in any sense detracting from the rights which they then had or thereafter might acquire against the defendant.   Notwithstanding their acts, the wrong-doer remained answerable to the landlords for les-

sening the value of the reversion, and to the tenants for lessening the value of the use during the term. That there might not be any danger of exacting of the defendant double payment, the judge told the jury to set off against the tenants' damages the reduction in rent which they had secured, so far as it was awarded in the verdicts to the landlords. This was abundantly favorable to the defendant.

As to the amounts of the verdicts, the conclusions of the jury seem to be within the fair range of the proofs, so that we are not at liberty to disturb them.

Let the rules to show cause be discharged.