42 N.J. Super. 590 (1956)
127 A.2d 441
MICHAEL J. CAFONE AND DANIEL SPILLANE, PLAINTIFFS-APPELLANTS,
v.
SPINIELLO CONSTRUCTION CO. AND NESTO CONSTRUCTION CO., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 10, 1956.
Decided October 10, 1956.
*593 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. Isador Kalisch argued the cause for the plaintiffs-appellants (Mr. David Roskein, attorney; Mr. Harry Kalisch, of counsel).
Mr. Newton H. Porter, Jr., argued the cause for the defendants-respondents (Messrs. Porter & Hobart, attorneys).
The opinion of the court was delivered by FRANCIS, J.A.D.
We are asked to review the legal propriety of the action of the County Court in granting defendants' motion for judgment at the close of the trial of these gas asphyxiation negligence cases. Alleged errors in the rejection of certain evidence are urged also as a basis for reversal.
Defendants Spiniello Construction Co. and Nesto Construction Co. entered into a joint contract with the City of Newark under which they agreed to clean and reline certain water mains in the City of Newark and the Town of Belleville. It is apparent from the agreement that when *594 a particular section was being worked on, it was taken out of operation as a main. In order to remove the water in such a section a Newark city employee would open blowoff valves which connected the main at intervals along its course with the sewer system. The water would then drain off by gravity.
Obviously it was expected that occasionally water would be pocketed at a point where the force of gravity could not accomplish its removal. In such situations the necessity of pumping was recognized. The contract contains a number of references to the operation. For example:
"S-5. * * * In connection with the work of cleaning and lining to be done under this contract, the City at its own expense shall shut off all valves and cocks to isolate the pipe lines from other distribution mains and house service connections; * * * shall operate main line valves, air valves and blowoff valves to drain the lines to the extent that they will empty by natural outflow by gravity without the use of pumps; * * *.
S-6. * * * and the removal by pumping or otherwise of all water which does not drain by gravity overflow from the pipes after existing blowoffs on the lines have been opened, and of any other water which may enter from any cause other than a leaking valve, shall be by and at the expense of the Contractor."
At the time of the events immediately preceding the unfortunate accident which gave rise to this litigation, defendants' employees had been working in an area where the 30-inch main crosses the Newark-Belleville boundary line. The entire undertaking for both companies, including this particular aspect of it, was in the general supervisory charge of Luke C. Spiniello, the president of Spiniello Construction Company.
Two holes several blocks apart had been cut into the main to enable the men "and a mechanical device" (not described) to enter in the performance of their tasks. One was north of Verona Avenue in Newark and the other at William Street in Belleville.
On March 4 or 5, 1953 a sizeable water pocket was discovered in the main between these two places of ingress and egress. It was nearer the entrance hole on the Newark *595 side. The pipe took a descending course there and the water had collected at the low point. The pipe turned upward, close to the northerly end of the water and so gravity could not cause it to drain off.
On March 6 at Spiniello's order an employee obtained a gasoline pump, described as a 2 1/2-inch pump, from the warehouse and brought it to the hole on the Newark side. (The 2 1/2-inch dimension relates to the diameter of the intake valve.) While the precise statement does not appear in the testimony, an inescapable inference is that the purpose was to use it to remove the water. Spiniello told the employee to put it inside the 30 inch main and try to start it. He succeeded in getting it about 10 or 15 feet inside but it was too "bulky" and use of the pull rope to put the engine in operation was impossible. So the attempt was abandoned.
Spiniello then telephoned the Homelite Corporation and purchased a 1 1/2-inch gasoline powered pump. After doing so, he sent another employee with a truck to pick it up and deliver it to the entrance hole at William Street on the Belleville side. Pursuant to this direction, the pump was obtained but the record is silent as to whether it was dropped off at the designated place. In this connection it may be noted from the sketch in evidence that the blowoff valve at Mill Street (mentioned above) was fairly close to the northerly end of the water and between it and William Street. Thus the nearest outlet to which the water could be drawn or pumped was this valve leading to the sewer. And some significance may be attached to the assertion of the deputy chief of the Belleville Fire Department that he "knew it was a physical impossibility to pump that water from the other end."
On the same day Spiniello communicated with the Newark engineer and asked for the opening of the blowoff valve. The request was complied with, although the time when it was done in relation to the other events of the day was not made the subject of testimony. But that it was an associated circumstance seems plain.
*596 The factual outline just recited resulted from the oral testimony of witnesses, the contract for the work and certain answers to interrogatories. In addition, at the trial it was shown that the police conducted an investigation in connection with the accident. Spiniello was interviewed and gave a signed affidavit which contained a somewhat more specific reference to the water pocket and the intention and manner of removing it. He said, among other things:
"On Wednesday and Thursday, March 4th and 5th, my men were trying to pump some water out of the pipe at the hole by the railroad track on Mount Prospect Avenue, Newark [the one referred to above as north of Verona Avenue] at which time the lower pocket of the pipe was full of water. Since the men could not pump the water out with the old pump, Friday, March 6, 1953 I sent my man over to Homelite Pump Co., in the morning to purchase a new pump. Sam Sedecino [Sudecemo?], who works for me drove to the Homelite Co., and purchased the 1 1/2" pump. * * *."
The detective who interviewed Spiniello and obtained the information was called as a witness and an effort was made to introduce the affidavit in evidence. Objection thereto was sustained. Spiniello was then put on the stand by the plaintiffs to identify his signature. He did so and also conceded that the contents of the affidavit were true. Again an attempt was made to obtain its admission. The offer was rejected upon the grounds that a post rem statement of an agent not made in the course and scope of his duties is not evidential against his principal and that since Spiniello had been called as a witness, he should first be examined on the subjects covered by the affidavit before it could have probative value for any purpose. The document was marked for identification and the action of the court with respect to it is cited as error. The problem will be discussed hereafter.
On Saturday morning, March 7, two of defendants' workmen, Perez and Crespo, entered the main at the William Street hole. Another employee, Martinez, drove the men there; then he dropped three others off at different work locations. Thereafter he returned to William Street. On *597 arrival, Spiniello was already on the scene. Martinez went down in the excavation to the pipe entrance and then heard yelling in the pipe. "Crespo was saying to Perez [in Spanish] `Perez, Perez, in the name of the Mother of God, what's the matter?' * * * [I]n broken English Perez replied, more or less, `pump' and `gas.'" He reported that the men were in trouble and Spiniello immediately sought help for them which resulted in the appearance on the scene of the rescue squad of the Belleville Fire Department, of which the two plaintiffs were members.
Spiniello's answers to interrogatories say that at the time he was told that Crespo and Perez were in trouble, blowers were in operation on the job. Moreover, according to Martinez, after the firemen arrived, he went down to "where the blow off is at Mill Street" and "stuck a blower in there" to send "fresh air" into the pipe. The sketch already referred to shows a manhole at Mill Street which leads into the sewer and to the blow off valve from the water main.
Testimony was adduced that the firemen were not told anything as to just what danger the men were encountering but both Cafone and Spillane put on masks before entering the main. This was said to be routine practice. However, it does appear that in an earlier undescribed proceeding, Spillane indicated that while he was not too clear about it they were told by a policeman or workman that "there was gas in there." Cafone went first after tying a rope around his body and leaving instructions that he would tug on the rope if he got into difficulty. The 30-inch diameter of the pipe made it necessary for him to proceed by crawling. After doing so for some distance he began to get sick. So he pushed off the mask, yelled "pull," adjusted the rope around his knees and then passed out. After being pulled out he was taken to the hospital.
Spillane then went in, wearing a mask connected to a tank of air, knee pads and a miner's type light on his cap. He had instructions to watch his air gauge until it was half gone and then to turn back. That state of depletion came about before he reached Crespo and Perez. He began to *598 feel drowsy and numb, so he lifted the mask and called to be taken out. Though his recollection is hazy as to events which immediately followed, he thought he crawled out without assistance. He, too, was removed to the hospital.
At about 10 A.M. an excavation was made about 850 feet south of the William Street entrance. It was just south of Mill Street and the sewer manhole and between the sewer and the point in the water main where the blow off valve was located. When the main was reached, it was broken into and the bodies of Crespo and Perez withdrawn. On autopsy and analysis of their blood and brains, it was determined that they died from carbon monoxide poisoning.
On admission of Cafone and Spillane to the hospital their difficulty was diagnosed as carbon monoxide poisoning. It is not necessary for purposes of this appeal to detail the nature and extent of their medical treatment and disability.
The record is barren of any proof that pipes or mains carrying carbon monoxide gas were connected with or anywhere in the area of the water mains in question. Nor is there any evidence showing that such gas could have come into the main through the blow off valve connection with the sewer.
Plaintiffs offered to prove that on Monday, March 9, at 9:30 A.M. an "engine," obviously meaning a gasoline pump, was taken out of the pipe at the Mill Street emergency rescue hole. It was shown that the physical conditions were the same as on Saturday when the dead men were removed therefrom. However, it appeared also that men had been working at the site, probably since 8 A.M. As a result, the trial court declined to allow the proffered fact to be introduced. The soundness of this ruling will be considered subsequently.
Defendants rested without offering any evidence on the liability aspect of the claims. They then moved successfully for judgment in their favor on the ground that no negligence had been established.
In appraising the validity of the ruling, it is a commonplace of our system that all of the plaintiff's evidence *599 must be taken as true; also they must be given the benefit of all reasonable inferences that can be drawn therefrom. When this has been done, if reasonable men might honestly differ as to whether negligence has been shown, the action must be submitted to the jury for determination. Antonio v. Edwards, 5 N.J. 48 (1950); McDermott v. Standard Accident Ins. Co., 40 N.J. Super. 119 (App. Div. 1956). In anticipation of the application of this rule, we have outlined the facts of plaintiffs' liability case in their most favorable light in relation to the proof and reasonable inferences therefrom.
Note may be made at the outset that the whole section of pipe under discussion had been taken out of operation as a water main for the purpose of the cleaning and relining. It was under the defendants' control. The opening of the blowoff valve near Mill Street by the representative of the City of Newark at Spiniello's request, was of fleeting significance and of insubstantial legal consequence as an interference with that control.
Water had become pocketed in the main and had to be withdrawn. It is clearly deducible that defendants intended to accomplish it and to do so by means of a gasoline-driven pump which would be placed inside the main. An attempt had been made to put the 2 1/2-inch pump inside and when it was found to be too large for the 30-inch main, a 1 1/2-inch one was purchased. Inferences that the acquisition was for the specific purpose and that the new pump was a smaller one which could be inserted in the pipe, are almost inescapable.
There is no dispute that the new pump was powered by gasoline. We take judicial notice that carbon monoxide gas would be given off by the combustion of the gasoline when the motor was in operation and that such gas is dangerous if inhaled, particularly when it is being generated in a confined space with limited ventilation. Warshawsky v. Nevins Bus Co., 9 N.J. Misc. 227 (Sup. Ct. 1931); Adams v. Lilbourn Grain Co., 226 Mo. App. 1030, 48 S.W.2d 147, 148 (Mo. Ct. App. 1932).
*600 Wigmore says that "[t]he presence of a design or plan to do or not to do a given act has probative value to show that the act was in fact done or not done. A plan is not always carried out, but it is more or less likely to be carried out." 1 Wigmore, Evidence (3d ed. 1940), § 102, at p. 534. And in 2 Id., § 237, he says: "The existence of a design or plan is usually employed evidentially to indicate the subsequent doing of the act designed or planned."
Plaintiffs' case does not rest upon mere proof of the plan. A number of acts and circumstances furnish evidence of execution thereof. The 2 1/2-inch pump had proved unsuccessful on the Newark side of the water because it was too bulky to be used inside the pipe. It seems likely that if it could have been placed outside the entrance hole at that point and a long hose projected from it downgrade within the pipe to the water several hundred feet away in order to pump the water uphill and out into the street, such an operation would have been engaged in. But this was not attempted. Instead, the 1 1/2-inch pump was bought and ordered delivered at the William Street entrance hole on the other or north side of the water. Why was this done? One explanation is the presence of the blow-off valve on that side, only a short distance north of the pocket. If this valve could be opened and the water drawn over the intervening elongated and inverted U-shape ( &utrif; ) of the pipe, it would come to a sharp downgrade which led directly toward the valve. Then the expulsion into the sewer would be brought about by the pump, aided at least to some extent by gravity.
Was the new pump to be set up outside the William Street hole, with a suction hose attached to what was called the intake side of the motor (the end of this hose to be put in the water) and a discharge hose attached to the other side (the end of this to be put in the blow-off valve)? Here again, such modus operandi seems unlikely. If that course were to be pursued, a reasonable assumption would be that the 2 1/2-inch pump would have been used, thus obviating the need for buying a new and smaller one. Or *601 if the blowoff valve was not to be used and instead the water was to be pumped back to the William Street hole, more than a thousand feet of suction hose would be needed and the water would have to be drawn uphill at least from Mill Street, a distance of about 850 feet, to the place of discharge. Probably that situation is what the deputy fire chief of Belleville had in mind when he said he "knew it was a physical impossibility to pump that water from the other end."
So the facts and the physical situation point circumstantially to the use of the pump inside the pipe and in closer proximity to the water and the blowoff valve. Concededly there is no direct evidence that the pump was inside when the workmen were over-come by carbon monoxide gas. But it was ordered delivered at the William Street entrance and it was not seen on the outside of the hole when the mishap occurred. The blowers were in operation sending fresh air into the main when Spiniello became aware that Crespo and Perez were in danger. And another blower was rushed into the sewer entrance at Mill Street near where they were working and met their death.
The main was exclusively in the hands of the defendants at the time. There were no gas pipes anywhere near. No possible source of carbon monoxide was shown except the gasoline pump. The only real clue presented as to the origin thereof comes from the poignant cry of Perez "pump"  "gas." He and Crespo died of carbon monoxide asphyxiation and their bodies were removed from the pipe about at Mill Street where it may be inferred reasonably they were using the pump in an effort to expel the water through the nearby blowoff valve.
Although the motion for judgment at the close of the plaintiffs' case was denied, the defendants offered no factual testimony with regard to the happening. Of course, there is no requirement in the law for them to do so if a prima facie case had not been made out. The effect of the course pursued is to present us with a record of the plaintiffs' proof alone and to make it necessary on our review to view *602 the facts and circumstances most favorably to the existence of a cause of action. The application of this test satisfies us that enough evidence was presented to justify circumstantially the inference that the pump was in operation in the main and that it produced the gas which accounted for the death of the two workmen and the asphyxiation of the two plaintiffs. Accord, Laughlin v. New York Power & Light Corp., Sup., 23 N.Y.S.2d 292 (Sup. Ct. 1940), affirmed 261 App. Div. 1107, 27 N.Y.S.2d 87 (App. Div. 1941) (opinion by dissenter only), affirmed per curiam 287 N.Y. 681, 39 N.E.2d 296 (Ct. App. 1942). And in our view such inference is not dependent for its existence upon the affidavit of Spiniello; it emerges sufficiently without regard thereto.
It is not necessary to pursue the issue of negligence at any length. Manifestly the act of the defendants in requiring the use of a gasoline pump capable of producing a deadly gas in a confined area, i.e., a pipe 30 inches in diameter, with little ventilation, raises an issue of negligence as to its own employees. That wrongdoing provides the base on which rests the cause of action of the attempted rescuers, Cafone and Spillane. The fact that the dependents of Crespo and Perez are limited to a remedy under the Workmen's Compensation Act does not interfere with the prosecution of plaintiffs' common law action.
The doctrine upon which plaintiffs' right of action is predicated received clear exposition by Judge Cardozo, then of the New York Court of Appeals, in Wagner v. International R. Co., 232 N.Y. 176, 133 N.E. 437, 19 A.L.R. 1 (1921). He said:
"Danger invites rescue. The cry of distress is the summons to relief. The law does not ignore these reactions of the mind in tracing conduct to its consequences. It recognizes them as normal. It places their effects within the range of the natural and probable. The wrong that imperils life is a wrong to the imperiled victim; it is a wrong also to his rescuer. The state that leaves an opening in a bridge is liable to the child that falls into the stream, but liable also to the parent who plunges to its aid. Gibney v. State, 137 N.Y. 1, 33 N.E. 142, 19 L.R.A. 365 (1893). The railroad company *603 whose train approaches without signal is a wrongdoer toward the traveler surprised between the rails, but a wrongdoer also to the bystander who drags him from the path. [Citing authorities.] The risk of rescue, if only it be not wanton, is born of the occasion. The emergency begets the man. The wrongdoer may not have foreseen the coming of a deliverer. He is accountable as if he had. Ehrgott v. Mayor, etc., of [City of] New York, 96 N.Y. 264, 280, 281."
See also: Tarnow v. Hudson & Manhattan R. Co., 120 N.J.L. 505, 507 (Sup. Ct. 1938), affirmed 121 N.J.L. 522 (E. & A. 1939); Maryland Steel Co. v. Marney, 88 Md. 482, 42 A. 60 (Ct. App. 1898); 65 C.J.S., Negligence, §§ 124, 126 (1950).

THE EVIDENCE PROBLEMS.

A.
As set forth above, proof that a pump was taken out of the main on the Monday morning following the accident, was excluded. The ruling was based on the proof showing that defendants' employees had been working since 8 A.M. in the particular location whereas the observation of the witness was made at about 9:30 A.M. Thus the possibility that the pump might have been placed there between 8 and 9:30 A.M. induced the court to reject the proffers. The purpose of the plaintiffs was to use the proof as some indication that the pump was in the pipe on Saturday. The treatment of matters of this sort is largely for the discretion of the trial court (Miller v. Trans Oil Co., 33 N.J. Super. 53, 59 (App. Div. 1954), affirmed 18 N.J. 407 (1955)), and we see no misuse thereof in relation to plaintiffs' purpose.
However, at the retrial we suggest another basis for relevancy. Defendants argue that there is no showing that the 1 1/2-inch pump was small enough to be placed inside the main. We have discussed previously the inferences to the contrary which may be drawn from the attempted use of the 2 1/2-inch pump and the purchase of the new one. But they are inferences only. Testimony that defendants' *604 employees actually removed the pump from the pipe is direct evidence that it would fit inside. Such fact is another link in the chain of circumstances tending to establish that the pump could have been used inside the pipe on Saturday morning.
Full discussion of the point, however, necessitates allusion to a condition appearing in the record which at retrial may justify, as a matter of discretion, the continued rejection of this evidence. A duplicate of the 1 1/2-inch pump was marked in evidence. It may have been obvious from its size as observed by the court and jury that it would fit inside the main. If so, the additional proof would be merely cumulative. No reference to its dimensions is disclosed and further treatment of the problem must be left for decision at the retrial.

B.

Admissibility of the affidavit of the president of Spiniello Construction Co.
This affidavit was rejected apparently on two theories, one, that Spiniello had no authority to make admissions against his principal, the Construction Co., and, two, that since he was put on the stand by plaintiffs as their witness and admitted that the contents thereof were true, the best evidence would be his oral testimony on the subjects covered in the paper.
It is true that declarations of an agent are not receivable against his principal unless they are within the scope of his duties and delegated authority. Hansen v. Eagle-Picher Lead Co., 8 N.J. 133, 145 (1951).
In our judgment the statements of Spiniello, orally or in writing, to the police were made within the apparent ambit of his agency. He was the president and part owner of the Spiniello Construction Co. and he was actively in charge of the performance of the cleaning and relining task. The police were conducting an investigation into an accident in the course of the company's operation during which two deaths and two injuries had occurred. The investigation *605 might have led to the indictment of the corporation for involuntary manslaughter. In that inquiry Spiniello undertook to speak for the company as he might reasonably be expected to do. His position as president and his actual knowledge of the company's conduct at the time certainly gave him apparent authority to represent his principal and to make declarations in its behalf in the public investigation. Cf. Halsey v. Lehigh Valley R.R. Co., 45 N.J.L. 26, 35 (Sup. Ct. 1883); Agricultural Ins. Co. of Watertown v. Potts, 55 N.J.L. 158, 162 (E. & A. 1892); Hollander v. Smith & Smith, 10 N.J. Super. 82, 87 (App. Div. 1950), certification denied, 6 N.J. 399 (1951).
An interesting and analogous case is Pan-American Petroleum & Transport Co. v. United States, 273 U.S. 456, 47 Sup. Ct. 416, 71 L.Ed. 734 (1927). In the Tea Pot Dome oil scandal Doheny, chairman of both corporate defendants, voluntarily appeared before a committee of the United States Senate which was investigating the oil leases for the purpose of explaining a money transaction between himself and the Secretary of the Interior Fall about the time of the lease negotiations. His statements to the committee were admitted in evidence against defendants in the subsequent government suit to cancel the leases.
The United States Supreme Court sustained the ruling, saying:
"The companies were much concerned as to the investigation lest it might result in an effort to set aside the transaction. The hearing before the committee was an occasion where it was proper for them to be represented. Doheny had acted for them from the inception of the venture. The facts and circumstances disclosed by the record justified the lower courts in holding that, when he testified before the committee, he was acting for the companies within the scope of his authority. His statements on that occasion are properly to be taken as theirs, and are admissible in evidence against them." (273 U.S., at page 499, 47 S.Ct., at page 422)
See also First National Bank of Xenia, Ohio v. Stewart, 114 U.S. 224, 228, 5 Sup. Ct. 845, 29 L.Ed. 101, 103 (1885).
We do not regard it as essential to admissibility that such declarations be expressly authorized. If they are *606 ordinary incidents of the position occupied by the agent, authority ought to be implied. Johnson v. J.H. Yost Lumber Co., 117 F.2d 53, 59 (8 Cir. 1941); 2 Fletcher, Cyclopedia of Corporations (perm. ed. 1954), § 745, at p. 1043.
Nor was it necessary for counsel for plaintiffs to examine Spiniello directly upon the subjects of the affidavit before attempting to offer it in evidence  even though he had been called by them to identify the signature and admit that the contents were true. Spiniello represented the adverse parties; in fact he might be expected to be their most important witness. The affidavit was being offered as an admission against his principal. As such, if admissible, it would constitute substantive evidence for the plaintiffs. See Miller v. Henderson, 41 N.J. Super. 15, 24, 26 (App. Div. 1956).
Furthermore, in the conduct of their case the plaintiffs were justified in limiting the admissions they wished to introduce in making out their prima facie case to those appearing in the affidavit. They should not be required to speculate to their possible great disadvantage on the scope of cross examination which might be opened up even if their direct examination of Spiniello produced the same statements as were in the affidavit. Accordingly, the declarations were admissible either through the oral testimony of the detective who heard them or by means of the affidavit, and the affidavit should have been received.
Under all of the circumstances, the judgment is reversed and a new trial ordered. Costs are to abide the event.