108 N.J. Super. 248 (1969)
260 A.2d 863
MICHAEL SEIDEL, PLAINTIFF,
v.
ABRAHAM GREENBERG, ET AL., DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided December 24, 1969.
*250 Mr. Ashley Goodman appeared for plaintiff (Messrs. Goodman & Goodman, attorneys).
Mr. Harvey Weissbard appeared for defendants (Messrs. Querques, Isles & Weissbard, attorneys).
ACKERMAN, JOHN A., J.S.C.
This matter was tried by the court without a jury. It presents novel questions as to whether the perpetrators of a crime are liable in a civil action for damages to an innocent person who was thereafter subjected to criminal prosecution for the commission of such crime.

I
The facts are not in dispute in any material aspect and the following summary contains the court's findings with reference thereto. On March 20, 1963 a $300,000 fire destroyed the buildings and stock in trade of the Malgreen Lumber and Supply Co. of Newark, New Jersey, and also destroyed adjoining property. Defendants to this action, Abe Greenberg and Manya Greenberg, his wife, were the sole or principal stockholders of said corporation and were the principal officers in charge of its business, which consisted of the operation of a retail lumber yard. It has been established that the Greenbergs conspired with one Nathaniel Wallace to have the premises of Malgreen burned to collect the insurance thereon, and that Wallace acted as the "go between" and arranged for the actual burning of the premises by one Clarence Moore, the "torch." Wallace was a carpenter and for a number of years had done business with the Greenbergs and with Malgreen. Some of the conferences between the Greenbergs and Wallace in planning the crime took place in the office at the premises of Malgreen during the period between October 1962 and the time of the fire. Plaintiff Michael Seidel, was the company credit manager and bookkeeper and had served as one of its key employees for a number of years. His duties required him to be inside and *251 he was usually in the company's office. Shortly before the fire, negotiations had been entered into, if not completely consummated, between the Greenbergs, who had become progressively less active in the management of the business (it is claimed that Mrs. Greenberg was in Florida from December 1962 until after the fire), and seven key employees, including plaintiff, whereby the net profits of the business for the year starting in January 1963 were to be divided pursuant to a profit-sharing plan under which Abe Greenberg was to receive 20% thereof and the seven employees 80% thereof, with plaintiff's share to be 20%.
On June 17, 1963, about three months after the fire, the Greenbergs and plaintiff were arrested and charged with arson to defraud insurance companies and conspiracy to commit arson. Similar charges were filed against Wallace and Moore.[1] Immediately following his arrest plaintiff was booked, fingerprinted, photographed, detained overnight in jail and released on $10,000 bail fixed by Chief Magistrate Castellano, who scheduled a hearing for June 25, 1963, which date was subsequently postponed until July 9, 1963. Newspaper publicity attended the arrests and preliminary hearing and, among other things, a news article appeared in the Newark Evening News on June 18, 1963, which contained plaintiff's name and his residence address in Newark and his picture, together with an account of his supposed involvement in the arson scheme. The Greenbergs denied any involvement as, of course, did plaintiff. The Greenbergs had their own attorney. Plaintiff had his own attorney, whose services were arranged for, in part at least, by the Greenbergs and the *252 Greenbergs agreed to pay for such counsel. At no time did the Greenbergs admit to plaintiff or to the law enforcement authorities their complicity in the matter.
On July 9, 1963, at the hearing before the chief magistrate, both Wallace and Moore pleaded innocent, waived hearing, and were held over for the grand jury. The attorneys for the Greenbergs and for plaintiff moved to dismiss the complaints against their clients on the ground that the accusations made against them by Wallace and Moore were not admissible in evidence. The chief magistrate announced that he would reserve decision on the motions for several days. News articles to that effect appeared in the Newark newspapers on July 10, 1963. On July 12, 1963 the chief magistrate dismissed the complaints against the Greenbergs and plaintiff. In a Newark Evening News article published on that date the public was advised that the complaints were dismissed because the chief magistrate had ruled that "the State has failed to produce prima facie evidence in this case and I therefore must dismiss it," and that "He said the only way in which the Greenbergs and Seidel were implicated was through remarks made by two prisoners as they were being brought into police headquarters * * *," and that "At that hearing Castellano upheld objections to any testimony about statements made to police by the pair involving the Greenbergs because they were not made in the presence of the Greenbergs."
On December 9, 1963 Wallace and Moore were indicted by the grand jury on charges of arson and burning to defraud insurance companies. Newspaper articles to that effect appeared in the Newark Evening News on December 9 and 10, 1963, which reported the indictments against Wallace and Moore and again recounted the charges against the Greenbergs and plaintiff and the dismissals thereof and the reasons for such dismissals as previously reported. The December 9 article included plaintiff's name and residence address in Newark, as well as those of the Greenbergs, and reported again, with reference to the earlier dismissals, that "Magistrate Castellano said at the hearing that the State *253 failed to produce `prima facie' evidence against the three. He observed that the only way that the three were implicated was through remarks made by Wallace and Moore, who told police they had a deal to set the fire. The Magistrate ruled out any statement made to police by Wallace and Moore because they were not made in the presence of the Greenbergs." Each of the news articles also referred to remarks made by the Essex County prosecutor with respect to the inconclusive nature of the investigation and the effect of the indictments against Wallace and Moore. The news article of December 10, 1963 quoted the prosecutor as stating that "I don't know that these indictments will end our investigation of the matter," and that "the grand jury was restricted from complete investigation because `certain people' could not be called as witnesses for legal reasons. He declined to name the individuals."
Wallace and Moore were subsequently convicted of the charges against them. On May 3, 1965 the Greenbergs were indicted on four counts charging them with setting fire to and burning the Malgreen buildings, goods and chattels, while insured, to defraud the insurance companies, of burning the buildings of Malgreen, of burning goods and chattels with intent to injure Malgreen, and of conspiring with Wallace and Moore to set fire to and burn the buildings, goods and chattels at the yard with intent to prejudice and defraud insurance companies. The Greenbergs were tried in the Essex County Court, Law Division, convicted on all counts and sentenced on February 9, 1967. On July 1, 1968 their convictions were affirmed by the Appellate Division of the Superior Court.
In June 1965, shortly after the Greenbergs were indicted but before their trial and convictions, plaintiff instituted this action against the Greenbergs and against Malgreen. The complaint charged the individual defendants with negligence in setting the fire and, alternatively, with committing arson and with "a willful and malicious tort" and "willful and deliberate acts against the interest of the plaintiff." Although *254 not artistically framed, the gravamen of the complaint is that the Greenbergs willfully and deliberately caused the fire, as a result of which plaintiff was arrested on a warrant of the Newark arson squad and charged with having conspired with defendants and others to have caused the fire. It is alleged that plaintiff was booked, fingerprinted, photographed, detained overnight in prison and subsequently released on bail; that his photograph appeared in the Newark Evening News in an article including him in the conspiracy and charging him with the crime of arson; that he was humiliated and degraded, caused to suffer physical and mental pain, loss of income and earnings, caused to have his privacy invaded and his name and reputation scandalized, and caused to incur medical and legal expenses and loss of employment. There were prayers for both compensatory and punitive damages. In a separate count plaintiff alleged that the Greenbergs promised to reimburse him for legal expenses incurred as the result of the charges against him, and he sought recovery of counsel fees in the amount of $2450 expended in connection with the proceedings against him. In another count it was alleged that plaintiff was under a profit-sharing agreement with defendant corporation which was negligently or willfully interfered with by the individual defendants, as the result of which plaintiff lost income to which he otherwise would have been entitled.
An answer was filed on behalf of defendants, generally denying the allegations of the complaint and reserving the right to move to strike the complaint on the ground that it failed to state any claim upon which relief could be granted.
At the trial, since the Greenbergs had in the meantime been convicted, plaintiff proceeded on the theory that the Greenbergs were guilty of deliberate and criminal acts in causing the fire rather than that they were guilty of negligence in causing the fire. The claims against Malgreen as a corporate entity were not pursued. Pursuant to Evidence Rule 63 (20), evidence of the final judgments adjudging the Greenbergs guilty of the offenses for which they were convicted was received *255 in evidence. The Greenbergs did not testify or offer any evidence to negate their guilt of said offenses.
Reference has heretofore been made to some of the findings of fact by the court. On the evidence adduced, it is clear that the Greenbergs committed willful and criminal acts in causing the fire to be set in order to defraud insurance companies, and that they conspired with Wallace and Moore to that end. It is clear that plaintiff had no part in said conspiracy and is entirely innocent thereof, and that defendants at all times have known of his innocence. It is clear that plaintiff has suffered the shame, humiliation and damage to reputation which one innocent of crime suffers when he is falsely accused and prosecuted therefor, and that he has suffered mental distress and physical pain and loss of income as a result thereof. Although it is clear that the most intense distress and humiliation undoubtedly occurred during the three-week period when the charges were made and pending against him, it is probable, and I find as a fact, that he suffered distress when news articles in December 1963 resurrected publicly the fact of the charges against him. And it is perfectly apparent that his vindication, upon the dismissal of the charges against him, was a cloudy one and has remained cloudy to date in view of subsequent events, including the subsequent indictment and conviction of the Greenbergs. It is perfectly clear that the Greenbergs, who were arrested with plaintiff and knew of the charges against him, were fully cognizant of the prosecution against him and the distress that he was being subjected to.
It is also perfectly clear that although the Greenbergs willfully caused the fire to occur, they never intended that their criminal acts and conspiracy should become known. Quite the contrary. They did not specifically intend that plaintiff, or any one else, be accused of criminal acts or subjected to any prosecution. They did not themselves make any accusations against him which set the proceedings in motion against him or caused their continuance. It is also clear that at no time did the Greenbergs, who knew of their own complicity *256 and that plaintiff was in no way involved, come forward to establish plaintiff's innocence or to endeaver to stop the proceedings against him on the ground that he was innocent. At no time, even after their convictions, have they come forward to clear his name. Finally, it is clear that if defendants had not performed their criminal acts and caused the fire to be set, plaintiff would not have suffered the injuries and damages for which relief is sought.

II
No direct precedent for plaintiff's action has been found in any reported case. In view of the rather perfunctory trial briefs filed by counsel, the court required supplemental briefs to be submitted. Neither the efforts of counsel nor extensive research by the court have brought to light any precedents on all fours.
Upon analysis, the claims asserted by plaintiff may be said to bear analogy to conventional theories for recovery for malicious prosecution, for invasion of privacy, for invasion and interference with contractual rights and prospective economic gain, for outrageous acts causing mental distress, for fraud and misrepresentation, for defamation, and for breach of contract. No case has been found in which it was held that one who commits a crime may be held civilly liable to an innocent person who was prosecuted criminally for the commission of such crime in the absence of the filing of charges or the making of accusations by the perpetrator of the crime which set the processes of the criminal law in motion against the plaintiff. Nor has any case been found which held that in such circumstances relief would be denied. The grievous damages and injuries which plaintiff has suffered are clearly those which one who has been the subject of a conventional malicious prosecution normally suffers. Is plaintiff entitled to recover from these defendants or is he to be denied relief?
It is axiomatic that the simple fact that his action does not fit into a nicely defined or established "cubby-hole" of *257 the law does not in itself warrant the denial of relief to him. Falzone v. Busch, 45 N.J. 559 (1965); Di Cristofaro v. Laurel Grove Memorial Park, 43 N.J. Super. 244, 254 (App. Div. 1957); Prosser, Law of Torts (3 ed. 1964) § 1, at 3-4. As stated by Dean Prosser:
There is no necessity whatever that a tort must have a name. New and nameless torts are being recognized constantly, and the progress of the common law is marked by many cases of first impression, in which the court has struck out boldly to create a new cause of action where none had been recognized before * * *. The law of torts is anything but static, and the limits of its development are never set. When it becomes clear that the plaintiff's interests are entitled to legal protection against the conduct of the defendant, the mere fact that the claim is novel will not of itself operate as a bar to the remedy.
After careful deliberation it is the court's conclusion that plaintiff is entitled to recover from defendants on the facts of this case upon principles of law which are encompassed within the fundamental and underlying principles of malicious prosecution and of liability for the performance of intentional, wrongful acts.
It is the normal rule in malicious prosecution cases that mere passive knowledge of, or acquiescence or consent in, the acts of another who causes a prosecution is not sufficient to make one liable, and that in order to impose liability there must be some affirmative action by way of advice, encouragement, pressure, etc., in the institution, or causing the institution, of the prosecution or in affirmatively encouraging its continuance after it has been instituted. It is commonly stated that an action for malicious prosecution is not favored in the law, and this is so because of the obvious public policy of having criminal's brought to the bar of justice and encouraging citizens to come forward to aid in the prosecution of criminals without fear of civil suits for damages for their acts in so doing. These rules have been formulated, however, in the usual malicious prosecution cases in which the defendant being sued was not the perpetrator of the crime *258 for which the innocent person was unfairly prosecuted. The fundamental and underlying basis for liability for malicious prosecution is stated in many cases and in secondary authorities in the language of proximate causation. Typical is the rule laid down in 54 C.J.S. Malicious Prosecution § 14, at 966, as follows:
The test of liability in an action for malicious prosecution is: Was defendant actively instrumental in putting the law in force? In order to sustain the action, it must affirmatively appear as a part of the case of the party demanding damages that the party sought to be charged was the proximate and efficient cause of maliciously putting the law in motion, and, if such fact appears, defendant is liable, although he did not actually make or sign the affidavit on which the warrant was issued, or although he was not the prosecutor of record. [Emphasis added]
Were the wrongful and intentional acts of defendants in causing the properties to be burned a "proximate and efficient cause" of the prosecution of plaintiff for burning said properties and of the damages and injuries which he suffered? In the court's opinion, they were. Certainly, so far as "causation in fact" is concerned, it is clear that they were. It is perfectly obvious that if defendants had not caused the buildings to be burned, plaintiff would never have been prosecuted for such burning. As a matter of logic and fact, defendants' criminal acts in wrongfully burning the building were clearly a substantial factor in bringing about such prosecution. As stated by Dean Prosser in Law of Torts, C. 7, § 41, at 240 et seq.:
An essential element of the plaintiff's cause of action for negligence, or for that matter for any other tort, is that there be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered. This connection usually is dealt with by the courts in terms of what is called "proximate cause," or "legal cause." There is perhaps nothing in the entire field of law which has called forth more disagreement, or upon which the opinions are in such a welter of confusion. Nor, despite the manifold attempts which have been made to clarify the subject, is there yet any general agreement as to the proper approach. Much of this confusion is due to the fact that no one problem is involved, but a *259 number of different problems, which are not distinguished clearly, and that language appropriate to a discussion of one is carried over to cast a shadow upon the others.
"Proximate cause"  in itself an unfortunate term  is merely the limitation which the courts have placed upon the actor's responsibility for the consequences of his conduct. In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the discovery of America and beyond. `The fatal trespass done by Eve was cause of all our woe.' But any attempt to impose responsibility upon such a basis would result in infinite liability for all wrongful acts, and would "set society on edge and fill the courts with endless litigation."

* * * * * * * *
Although it is not without its complications, the simplest and most obvious problem connected with "proximate cause" is that of causation in fact. Of all of the questions involved, it is easiest to dispose of that which has been regarded, traditionally, as the most difficult: has the conduct of the defendant caused the plaintiff's harm? This is a question of fact. It is, furthermore, a fact upon which all the learning, literature and lore of the law are largely lost. It is a matter upon which any layman is quite as competent to sit in judgment as the most experienced court. For that reason, in the ordinary case, it is peculiarly a question for the jury.
Causation is a fact. It is a matter of what has in fact occurred. A cause is a necessary antecedent: in a very real and practical sense, the term embraces all things which have so far contributed to the result that without them it would not have occurred. It covers not only positive acts and active physical forces, but also pre-existing passive conditions which have played a material part in bringing about the event. In particular, it covers the defendant's omissions as well as his acts. The failure to extinguish a fire may be quite as important in causing the destruction of a building as setting it in the first place.
The existence of "causation in fact" having been established, the problems of "proximate cause," "foreseeability," "duty," "intervening cause" and the like are presented. In the last analysis, they resolve themselves down to problems, not simply of factual casuation, but rather of policy, justice and fairness.
In Goldberg v. Housing Authority of Newark, 38 N.J. 578, 10 A.L.R.3d 595 (1962), Chief Justice Weintraub said in a negligence case:
The question whether a private party must provide protection for another is not solved merely by recourse to `foreseeability.' Everyone *260 can foresee the commission of crime virtually anywhere and at any time. * * *
The question is not simply whether a criminal event is foreseeable, but whether a duty exists to take measures to guard against it. Whether a duty exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution. [at 583]
In a similar vein, Justice Hall, writing for the court in a recent negligence case, Caputzal v. The Lindsay Co., 48 N.J. 69 (1966), pointed out that in the last analysis both "foreseeability" and "proximate cause" involve problems of policy. With respect to "foreseeability" he said:
* * * Foreseeability is not solely a mere matter of logic, since anything is foreseeable, but frequently involves questions of policy as well. When it does, the matter is one for determination by the court and not by the fact finder. [at 75]
With respect to "proximate cause," he said:
* * * Utilization of that term to draw judicial lines beyond which liability will not be extended is fundamentally as an instrument of fairness and policy, although the conclusion is frequently expressed in the confusing language of causation, "foreseeability" and "natural and probable consequences." Many years ago a case in this State hit it on the head when it was said that the determination of proximate cause by a court is to be based "upon mixed considerations of logic, common sense, justice, policy and precedent." Powers v. Standard Oil Co., 98 N.J.L. 730, 734 (Sup. Ct. 1923), affirmed c.b. 98 N.J.L. 893 (E. & A. 1923). Dean Prosser puts it well in this fashion:
"As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability. Some boundary must be set to liability for the consequences of any act, upon the basis of some social idea of justice or policy.
This limitation is sometimes, although rather infrequently, one of the fact of causation. More often it is purely one of policy, of our more or less inadequately expressed ideas of what justice demands, or of administrative possibility and convenience, none of which have any connection with questions of causation at all." (Prosser, op. cit. supra, at 240-41). [at 77-78]
*261 Even in conventional negligence cases, although the test of "foreseeability" is customarily applied and presents no problem in the relatively simple case, the requirement of foreseeability is abandoned where principles of logic, fairness and justice dictate that a defendant should be held liable even though the plaintiff's harm was not logically foreseeable. The reported cases abound with such examples. See Glaser v. Hackensack Water Co., 49 N.J. Super. 591 (App. Div. 1958); Mitchell v. Friedman, 11 N.J. Super. 344 (App. Div. 1951); see Cafone v. Spiniello Construction Co., 42 N.J. Super. 590, 603 (App. Div. 1956); see Avedisian v. Admiral Realty Corp., 63 N.J. Super. 129 (App. Div. 1960); Restatement, Torts 2d, §§ 430-433A, 435, 439, 440-461; Prosser, op. cit, cc 9 and 10, at 282-357. Recognizing, even in negligence cases, that foreseeability is not always a prerequisite to liability, the Restatement, Torts 2d, § 435, has adopted a rule which permits liberal use of hindsight. As stated by Dean Prosser:
Recognizing these difficulties, there are courts which have thrown over the language of foreseeability, and have said outright that this becomes a matter of hindsight, which is to say of relating the consequences back into the picture of the original negligence after they have in fact occurred.
The Restatement of Torts has offered much the same approach by saying that the defendant is not to be liable for consequences which, looking backward after the event with full knowledge of all that has occurred, would appear to be "highly extraordinary." The language may be unfortunate; to one gifted with omniscience as to all existing circumstances, no result could appear remarkable, or indeed anything but inevitable, as a matter of hindsight. Certainly no element of mystery is necessary, or of ignorance as to what has happened. Perhaps the Restatement has come close to expressing the underlying idea of a limitation of liability short of the remarkable, the preposterous, the highly unlike, in the language of the street the cockeyed and far-fetched, even when we look at the event, as we must, after it has occurred. [at 307]
See Caputzal v. Lindsay Co., 48 N.J. 69, 78 (1966).
A different matter is presented where intentional acts are involved and it is clear that the rules of causation are more liberally applied to hold a defendant responsible for *262 the consequences of his acts. It is well settled that where the acts of a defendant constitute an intentional tort or reckless misconduct, as distinguished from mere negligence, the aggravated nature of his acts is a matter to be taken into account in determining whether there is a sufficient causal relation to plaintiff's harm to make the actor liable therefor. His intention to commit a wrongful act, the degree of his moral wrong in acting, and the seriousness of the harm which he intended are important factors in determining whether he is liable for resulting unintended harm. In applying concepts of "foreseeability" and "proximate cause" in such cases there is more extended liability, and in a case involving such aggravated acts a fact finder may be permitted to find that the actor's conduct bears a sufficient causal relation to a plaintiff's harm so as to make him liable, although no such finding would be permissible if defendant's conduct were merely negligent. Restatement, Torts 2d, §§ 435B, 501 (2); Restatement, Torts, § 870(d); Prosser, op. cit., c. 9, § 50, at 302; Bauer, "The Degree of Moral Fault as Affecting Defendant's Liability," 81 U. Pa. L.R. 586, 592-596 (1933); 52 Am. Jur. Torts, §§ 32-33, at 382-383; 38 Am. Jur., Negligence, § 52, at 700; Isham v. Dow, 70 Vt. 588, 41 A. 585, 45 L.R.A. 87 (Sup. Ct. 1898); State v. Glover, 330 Mo. 709, 50 S.W.2d 1049, 87 A.L.R. 400 (Sup. Ct. 1932); see Morrison v. National Broadcasting Co., 24 A.D.2d 284, 266 N.Y.S.2d 406, 413, 16 A.L.R.3d 1175 (App. Div. 1965), affirming as modified, 40 Misc.2d 876, 243 N.Y.S.2d 927 (Sup. Ct. 1963), rev. on other grounds, 19 N.Y. 2d 453, 280 N.Y.S.2d 641, 227 N.E.2d 572 (Ct. App. 1967); see Davidson v. National Broadcasting Co., 26 Misc.2d 936, 204 N.Y.S.2d 532 (Sup. Ct. 1960).
In Derosier v. New England Tel. & Tel. Co., 81 N.H. 451, 130 A. 145 (Sup. Ct. 1925), the court said on this point:
* * * In determining how far the law will trace causation and afford a remedy, the facts as to the defendant's intent, his imputable knowledge, or his justifiable ignorance are often taken into account. *263 The moral element is here the factor that has turned close cases one way or the other. For an intended injury the law is astute to discover even very remote causation. * * *
This is not because the defendant's act was a more immediate cause in one case that in the others, but because it has been felt to be just and reasonable that liability should extend to results further removed when certain elements of fault were present. Treating all these cases as turning upon an issue of immediateness of causation has resulted in much confusion of ideas and made the conflict of decisions appear to be greater than it is. Most of the cases wherein inability to foresee has been held to be an answer to the plaintiff's claim of causation are those where the result was not immediate, but depended largely upon extrinsic and intervening causes. The result was somewhat remote, and a morally innocent party ought not to be held liable, though one morally guilty should be. The decisions do not turn on remoteness of causation alone, but upon such remoteness plus freedom from moral fault. [130 A., at 152]
A typical example of such extended liability is that exemplified by the doctrine of "transferred intent" as it is applied in intentional torts to the person. Restatement, Torts 2d, § 16(2); Prosser, op. cit., at 36-37; 1 Harper & James, The Law of Torts (1956), § 3.3, at 218. As stated by the authors in the latter treatise:
* * * Indeed, it is not even necessary that the defendant intend to invade the plaintiff's interest if he intended to commit the battery on someone. Thus, by the fiction of "transferred intent," a defendant who intends to strike a third person is liable if his blow miscarries and he strikes the plaintiff.
As has been pointed out, it is not easy to explain on logical principles the liability of one who, having directed a blow at one person, injures another, if he had no reason to believe the other was present and thus likely to be hurt. There is no intention to harm the plaintiff and no negligence toward him. The rule has been likened to that imposing liability without fault. A similar situation is involved in the rule that where the defendant intended to inflict a harmful or offensive contact, he is liable for the results even though they are unintended and unforeseeable. But as a matter of sound social policy, it is clearly better that the risk of such unintended and unforeseeable consequences should fall on the intentional wrongdoer than on his victim. The former is a tort-feasor and the latter is innocent. The wrongdoer, thus, should bear the loss. [at 218]
In the recent decision in Tate v. Canonica, 180 Cal. App. 2d 898, 5 Cal. Rptr. 28 (D. Ct. App. 1960) the court said:
*264 The law has for a long time recognized a distinction between intentional and negligent torts, and has generally recognized fewer defenses, and been more inclined to find that defendant's conduct was the legal cause of the harm complained of, where the tort is intentional. (Cf. Holmes, "Privilege, Malice, and Intent," in "Collected Legal Papers," p. 117 ff; Civil Code, §§ 1708, 1714.) Indeed, it appears that many of the limitations upon liability that are subsumed under the doctrine of "proximate cause." as usually expounded in negligence cases do not apply to intentional torts. * * *
And Dean Prosser has stated:
One area in which it may be especially likely that the "foreseeability" limitation will be cast aside is that of intentional torts, as to which it has been said often enough that there is more extended liability. This appears to be, however, more of a general attitude and an unexpressed tendency than anything like a concrete rule.
The objection frequently has been made that such decisions may impose a ruinous liability which no private fortune could meet, and which is out of all proportion to the defendant's fault. To this it has been answered that if a great loss is to be suffered it is better that it should fall upon the wrongdoer than upon one innocent victim, or a hundred. "The simple question is, whether a loss, that must be borne somewhere, is to be visited on the head of the innocent or guilty." But the difficulty lies not so much in any injustice to the defendant as in the delimitation of such liability beyond the risk. * * * [at 302, 303.]
The same principles apply in the application of the concepts of "intervening cause" and "superseding cause." There is always a problem as to whether a defendant is to be held liable for an injury or damage to which he has in fact made a substantial contribution, when it is brought about by a later cause of independent origin for which he is not responsible.
It has been argued in this case, applying principles set forth in conventional malicious prosecution cases, that the prosecution of plaintiff was brought about by the intervening and independent acts of law enforcement authorities who filed the complaint against him after making their own investigation and appraisal, and that their acts should insulate defendant. See Magowan v. Rickey, 64 N.J.L. 402 (Sup. Ct. 1900); *265 Mac Laughlin v. Lehigh Valley R. Co., 93 N.J.L. 263 (Sup. Ct. 1919); Prostick v. Vroom, 129 N.J.L. 465 (E. & A. 1942); Annotation. "Reliance on advice of prosecuting attorney as defense to malicious prosecution action," 10 A.L.R.2d 1215 (1950). The above decisions were rendered in normal malicious prosecution cases where the defendant was not the perpetrator of the crime. The rationale of these cases is that if a citizen comes forth and tells a prosecuting officer truthfully what he knows and the prosecuting officer files a complaint, defendant is not liable for malicious prosecution. Obviously, these decisions are supported by a strong public policy in favor of having third persons come forward to aid in the prosecution of crimes without fears of reprisal by civil suits, but that underlying policy, as has heretofore been pointed out, is not applicable on the facts of this case.
Viewed from the point of proximate causation, it is largely a matter of policy, justice and fairness whether the acts of the prosecuting authorities in making a complaint or the acts of defendants' co-conspirators in accusing plaintiff of complicity are to be deemed "intervening" or "superseding" causes which break the chain of causation from defendants' acts or are simply to be considered "concurrent" or "contributing" causes which do not break the chain. Clearly, they were dependent acts or causes triggered by and related to defendants' wrongful acts. As stated in Restatement, Torts 2d, § 441, at 466, "A dependent intervening force is one which operates in response to or is a reaction to the stimulus of a situation for which the actor has made himself responsible by his * * * conduct."
As stated by Dean Prosser with respect to "intervening" and "superseding" causes in negligence cases:
In dealing with a large group of cases, it is convenient to adopt the language frequently used by the courts, and to speak of intervening causes, or intervening forces. On its face, the problem is one of whether the defendant is to be held liable for an injury to which he has in fact made a substantial contribution, when it is brought about by a later cause of independent origin, for which he is not responsible. *266 In its essence, however, it becomes again a question of the extent of the defendant's original obligation; and once more the problem is not one of causation at all, since it does not arise until causation is established. It is rather one of the policy as to imposing legal responsibility. The older cases tend to ask the question, why should the defendant be held liable for harm brought about by something for which he is not responsible? The later ones tended to ask instead, why should he be relieved of liability for something that he has caused, along with other causes?" [Prosser, op. cit., at 309]
As is indicated above, even in negligence cases "foreseeability" is not always the test in determining whether the chain of causation will be deemed broken by an intervening cause, see Cafone v. Spiniello Construction Co., 42 N.J. Super. 590, 603 (App. Div. 1956); Prosser, op. cit., § 51, at 315 et seq., and, in cases of intended torts and aggravated acts, the courts are inclined to extend liability and hold that such acts do not break the chain of causation but are simply concurrent or contributing causes which do not relieve the original actor of liability. See Tate v. Canonica, supra; Prosser, op. cit., c. 9, § 51, at 320, n. 9; Restatement, Torts 2d, §§ 440-452; Commonwealth v. Almeida, 362 Pa. 596, 68 A.2d 595, 12 A.L.R.2d 183 (Sup. Ct. 1949), cert. den. 339 U.S. 924, 70 S.Ct. 614, 94 L.Ed. 1346 (1950). Again, once the matter of causation in fact has been established, the matter is largely one of policy, justice and fairness. See Rappaport v. Nichols, 31 N.J. 188, 205, 75 A.L.R.2d 821 (1959); Menth v. Breeze Corporation, Inc., 4 N.J. 428, 18 A.L.R.2d 1071 (1950).
What do the foregoing precedents demonstrate? Even in the case of negligent acts the courts have been hard pressed to lay down a test which affords a workable rule of law for limiting the liability of a defendant where his acts have a causal relation in fact to the harm suffered by the plaintiff. As stated by Dean Prosser:
It seems evident that in all of these proposed rules and formulae the courts and the writers have been groping for something that is difficult, if not impossible, to put into words: some method of limiting liability to those consequences which have some reasonably close connection with the defendant's conduct and the harm which it originally *267 threatened, and are in themselves not so remarkable and unusual as to lead one to stop short of them. It may be questioned whether anyone has yet succeeded in accomplishing more than the courts themselves have been able to achieve with the idea of such a reasonably close connection contained in the despised word "proximate," which may have more in the way of merit than is usually credited to it. [Prosser, op. cit., at 309]
And he has further stated:
* * * "Proximate cause" cannot be reduced to absolute rules. No better statement ever has been made concerning the problem than that of Street: "It is always to be determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy and precedent. * * * The best use that can be made of the authorities on proximate cause is merely to furnish illustrations of situations which judicious men upon careful consideration have adjudged to be on one side of the line or the other." [Ibid., at 288.].
In the case of liability for intended or aggravated acts, such as those involved here, although it is clear that there is extended liability and the rules of proximate causation are more liberally applied to hold a defendant liable, there is even less articulation in the cases of any workable rule which may be applied by a trial court. See Prosser, op. cit., § 50, at 303. In such case the court can only seek to draw upon such precedents as are available, applying the rules of causation with greater liberality than would be justified in a conventional negligence case. Foreseeability, as such, is not the test. If, weighing the moral fault of a defendant and applying the rules of causation liberally, the consequences have some reasonably close connection with defendants' conduct and the harm threatened, and in themselves, using hindsight, are not deemed preposterous or far-fetched, defendant should be held liable. Concepts of policy, fairness and justice are entitled to great weight.
Applying the foregoing principles, it is the court's conclusion that defendants are liable to plaintiff for the damages which he suffered because of his criminal prosecution. In effect, the holding of the court is that they are *268 liable to him for malicious prosecution and there is no need to consider or pass upon defendants' liability, if any, for any other consequences of their acts.
Here defendants performed intentional acts of moral turpitude condemned by our criminal laws. The acts were performed in conspiracy with others and with stealth. The properties burned were business properties and the burning was done in order to obtain insurance monies, obviously as a fast but effective way to liquidate the business and to convert the same into cash for the benefit of those who were the proprietors. It is not without significance that when the crime was first conceived, as well as during the time when the conspirators were actually conspiring and carrying their criminal plan into fruition, the employees of Malgreen, including plaintiff, were pressing defendants for the adoption of a profit-sharing plan which would reduce their share of profits to a much smaller portion thereof. It is not unreasonable to draw an inference that a contributory motive of the Greenbergs for the burning was a desire not only to retire from the business with cash but also to avoid turning over the fruits of the business to employees, including plaintiff, who were actually running the business and were seeking a larger share for their labors. Although defendants did not intend that plaintiff be prosecuted for their acts, it is not entirely clear that there was not some motive in their crimes for causing some harm to plaintiff and depriving him of future economic benefits. It is not necessary to make a finding in that regard, but it is clear that for all practical purposes there was an employer-employee relationship between defendants and plaintiff and that the crime was not unrelated to the business of which plaintiff was an employee.
In any event, so far as defendants were concerned, they knew they were committing crimes and, although foreseeability is not the sole test, it was certainly foreseeable to them that an investigation might follow and that criminal prosecution might follow. See Weaver v. Bank of America *269 Nat. Trust & Sav. Assn., 59 Cal.2d 428, 30 Cal. Rptr. 4, 380 P.2d 644 (Sup. Ct. 1963). Since the properties burned were business properties, it was certainly foreseeable that suspects might include those on the inside who had something to do with the business. Since outsiders were included in the conspiracy and since some of the conferences in planning the conspiracy took place in the business office at the yard, it was foreseeable that the co-conspirators might not know who all the conspirators actually were and that other employees, although innocent, might give the appearance of being a part of the conspiracy or at least give some reason, simply from their presence, for suspicion that they were. It was foreseeable to defendants that there might be a falling-out between them and their co-conspirators, and that the consequences thereof could not be controlled by defendants. It was foreseeable that the co-conspirators might be apprehended and, particularly if defendants reneged on their end of the criminal scheme after the burning, that their co-conspirators might "talk," and defendants knew that they could not control their co-conspirators in that regard. Finally, it is crystal clear that, but for the conspiracy and the burning, plaintiff would never have been subject to criminal prosecution.
As a matter of logic, justice and policy, considering the relationship of the parties and the facts presented, defendants are liable for such prosecution. Defendants performed wrongful and illegal acts which, in a real sense, were much akin to the proverbial throwing of the lighted squib into the crowded marketplace, Scott v. Shepherd, 2 W. Bl. 892, 96 Eng. Repr. 525, 38 Am. Jur., § 77, at 737. Although, as noted above, it is not necessary to define all the consequences of their acts for which they should be held liable, they are liable for the wrongful prosecution of plaintiff.
Having determined that defendants are liable to plaintiff because his wrongful prosecution was proximately caused by the wrongful criminal acts for which they were convicted, *270 it is not necessary to pass upon other theories for imposition of liability.[2]

III
No useful purpose would be served in reviewing the evidence in detail as to the damages sustained by plaintiff. He is entitled to the damages normally recoverable in a malicious prosecution case. He is entitled, among other things, to recover for his shame, humiliation, embarrassment, mental distress and damage to reputation. Although, as stated above, his mental distress was most acute during the *271 period of approximately three weeks when the charges were pending against him, he continued to suffer for months thereafter, and his suffering was renewed and revisited upon him when newspaper articles, some five months after the charges against him had been dismissed, repeated the details of the charges against him. The manner in which the charges against him were dismissed gave him a rather cloudy vindication and he suffered the effects thereof. Although he cannot recover because of the shame and humiliation which his family suffered, he is entitled to recover for his own mental anguish caused by their distress. Flam v. Lee, 116 Iowa 289, 90 N.W. 70 (Sup. Ct. 1902); Prosser, op. cit., § 113, at 869. He testified as to the physical suffering which he underwent and the medical expenses which he incurred, and he is entitled to recover therefor. Some weeks after the charges were dropped he left his employment at Malgreen because the Greenbergs refused to pay for his legal expenses as they promised. He is entitled to recover for such legal expenses in defending the criminal charges against him and in defending a civil suit initiated against him by the adjoining property owners whose property was destroyed by the fire caused to be set by defendants. He had customarily done accounting work for private clients while he was working at Malgreen and he was deprived of income because of the loss of a portion of that work as the direct result of the charges against him. He is entitled to compensatory damages for all of these items.
A judgment will be entered in favor of plaintiff and against the individual defendants in the amount of $10,000 with costs. In the circumstances, his prayer for punitive damages is denied.
NOTES
[1] The matter was apparently brought to a head when Abe Greenberg went to the police on or about June 14, 1963 and complained that his life had been threatened by Wallace. Wallace was apprehended and "talked," disclosing the conspiracy with the Greenbergs and claiming that the Greenbergs had reneged on paying him 25% of the insurance proceeds. Plaintiff was apparently implicated because of statements by Wallace that plaintiff had been present in the office at a conference or conferences held in furtherance of the conspiracy.
[2] It can be argued, particularly in view of the employer-employee relationship between the parties, Prosser, op. cit., § 54, at 337; see Szabo v. Pennsylvania Railroad Co., 132 N.J.L. 331 (E. & A. 1945), that once defendants knew plaintiff had been arrested they had a duty to speak and to come to his "rescue" to prevent further harm from occurring to him because of their original criminal acts. See Restatement, Torts 2d § 322; 1 Harper & James op. cit., § 7.14, at 588. It is unquestioned that defendants knew of all the proceedings against him and had ample opportunity to speak up in an endeavor to save him from harm. It is likely that, in order to comply with a duty to speak, they would have had to implicate themselves and waive their privilege against self-incrimination. A strong argument can be made that, although they were privileged not to incriminate themselves, they should nevertheless be held liable to plaintiff for failure to comply with a duty to speak and that the imposition of civil liability does not violate their constitutional rights. Duratron Corp. v. Republic Stuyvesant Corp., 95 N.J. Super. 527 (App. Div. 1967), certif. den. 50 N.J. 404 (1967). See Brown v. United States, 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958); Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967); Annotation, "Testifying in civil proceeding as waiver of privilege against self incrimination," 72 A.L.R.2d 830 (1960); Annotation, "Dismissing Action or Striking Testimony where Party to Civil Action Asserts Privilege Against Self-Incrimination as to Pertinent Question," 4 A.L.R.3d 545 (1965); Note; "Use of the Privilege Against Self-Incrimination in Civil Litigation", 52 Va. L.R. 322 (1966); 8 Wigmore, Evidence (1961), §§ 2250 to 2266. The court expresses no opinion on this point. Nor is it necessary to determine whether liability may be imposed upon some theory of defamation by association or concealment and nondisclosure. See Morrison v. National Broadcasting Corporation, supra; Davidson v. National Broadcasting Corporation, supra; 1 Harper & James, op. cit., § 7.14, at 588.