EXETER TOWERS ASSOCIATES, Brian M. Capalbo, P. Edward Capalbo, Ronald E. Capalbo, Lawrence Dukatz, Edward R. Goldberg, Erza Goldberg, M. Howard Jacobson, Stuart R. Jaffee, Noel G. Posternak, David B. Reen, and Michael H. Smith, Plaintiffs,

v.

Robert S. BOWDITCH, Jr., Wesley E. Finch, and Fleet National Bank, Defendants.

Civ. A. No. 84–3464–K.

United States District Court, D. Massachusetts.

March 28, 1985.

---

Robert D. Cohan, Boston, Mass., for plaintiffs.

Jeffrey B. Rudman, Stephen A. Jonas, Lee Johnson, Hale & Dorr, Boston, Mass., for Bowditch.

Daniel L. Goldberg, William G. Southard, Bingham, Dana & Gould, Boston, Mass., for Finch.

James P. Marusak, Hinckley, Allen, Tobin and Silverstein, Providence, R.I., for Fleet Nat. Bank.

## OPINION

KEETON, District Judge.

A Massachusetts limited partnership, Exeter Towers Associates, and its limited partners have filed this action against the general partners for breach of contract, breach of fiduciary duty, fraud, unfair and deceptive practices in violation of the Massachusetts Regulation of Business Practices for Consumers Protection Act, and racketeering activities in violation of the Racketeer Influenced and Corrupt Organi-

zations Act (RICO). The general partner defendants have filed a motion to dismiss this case for lack of subject matter jurisdiction under Rule 12(b)(1), because the plaintiffs have failed to state a claim under RICO—the only alleged basis for federal jurisdiction in this case. If the motion is granted, they request that the pendent state claims also be dismissed without prejudice to refiling in state court. Defendant Fleet National Bank has filed a motion to dismiss based upon several grounds. Plaintiffs have filed a motion to amend their complaint to include additional defendants and several new state causes of action. I treat the general partner defendants' motion as one filed under Rule 12(b)(6) and dismiss the RICO claim. I deny the plaintiffs' motion to amend the complaint because no independent basis for jurisdiction is alleged, and I also decline to exercise pendent jurisdiction over the state law claims. In light of these rulings, I grant Fleet National Bank's motion to dismiss.

## I.

On November 21, 1977, the general partners formed a partnership to acquire a parcel of real property and to construct, maintain, and operate an apartment complex on that property. The partnership acquired several mortgages, which were eventually consolidated into one mortgage with a face value of $4,862,800. In the fall of 1978 the general partners circulated a confidential memorandum to attract several investors to purchase limited partnership interests. On March 26, 1981, the primary lending institution assigned the mortgage to the Government National Mortgage Association, which offered the mortgage in an auction to Federal Housing Association (FHA) approved mortgagees. In the auction the general partners, without notifying the limited partners, purchased the mortgage for $3,000,000 through an agreement with Merrill, Lynch, Huntoon, Prize, Inc. (Merrill Lynch), an FHA approved purchaser. The purchase was made by the general partners individually and not by the partnership. The limited partners were not approved mortgagees and were not aware of the auction. Merrill Lynch eventually assigned the mortgage to Merchants Bank. The purchased mortgage was held by Merchants Bank for two and a half years. It was assigned to Fleet National Bank on August 2, 1984.

In the Spring of 1983 plaintiffs became aware of the mortgage and asserted a 90% interest in any future profits derived from its sale. The limited partners claimed that the general partners used partnership information to purchase the mortgage, and such actions constituted a fraud upon the limited partners and the partnership. They also contend in this action that the general partners' interest in the mortgage created a conflict of interest with respect to the sale of the partnership property. On July 3, 1984, the partnership sold Exeter Towers for $7,900,000. The mortgage is now valued at a sum of about $1,000,000 over the original purchase price.

On October 31, 1984, plaintiffs instituted this action and simultaneously filed a motion for a temporary restraining order and a preliminary injunction. Plaintiffs included Fleet National Bank as a defendant and sought a declaratory judgment against the bank as to their rights in the mortgage. I granted the temporary restraining order on that day and scheduled a hearing. At the conclusion of the hearing, on November 9, 1984, I vacated the former order, and denied the plaintiffs' motion for a preliminary injunction. Plaintiffs have filed a motion for reconsideration and to reinstate the temporary restraining order. I deny the motion for reconsideration. For the reasons stated during the hearing of November 9, 1984, and in this Opinion, I conclude that plaintiffs have failed to satisfy the requirements of Rule 65.

The only basis for this court's jurisdiction in this action is the federal RICO count. I conclude that if the RICO count is

dismissed, then the pendent state claims should also be dismissed.

Have the plaintiffs stated a cause of action under civil RICO?

Under 18 U.S.C. § 1964(c) (1982), "Any person injured in his business or property by reason of a violation of section 1962 ... may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." Section 1962(c) provides that "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Section 1962(d) prohibits a conspiracy to perform such activities. A "pattern of racketeering activity" is generally defined as two violations of specified federal statutes within a ten-year period. *See* 18 U.S.C. § 1961(5) (1982).

If one disregards the connotations of "racketeering" and "pattern of racketeering activity," the definitions in 18 U.S.C. § 1961 (1982) may lead to a very broad construction of the statute as tending to federalize most garden variety common law actions for fraud. Some of the conflicting precedents appear to support this construction. Others do not. Neither the Supreme Court nor the First Circuit has yet addressed this question.

I turn, first, to an examination of the precedents and then to other factors bearing upon the decision in this case—factors relevant to predicting how this disputed issue is most likely to be resolved by the Supreme Court, at least insofar as is necessary to the decision of the present case.

## II.

Among the precedents favoring a very broad construction of the statute is *Harco,*

*Inc. v. American National Bank & Trust Co.,* 747 F.2d 384 (7th Cir.1984) (*Harco, Inc.*), cert. granted, —— U.S. ——, 105 S.Ct. 902, 83 L.Ed.2d 917 (1985). In *Harco, Inc.* the Seventh Circuit rejected all limitations upon civil RICO other than the requirements explicitly stated in the statute:

With respect to the case before us, it does not seem at all likely that Congress anticipated the application of civil RICO to improperly calculated interest charges by a commercial bank. And this may or may not be an appropriate subject for this federal statute. Nevertheless, it does not seem fitting for us to attempt to narrow the statute in ways which are nearly impossible to rationalize merely to exclude subjects of this kind. For to say that Congress did not anticipate this subject is not to say that Congress would have excluded it if the subject had been brought explicitly to its attention. Congress appears to have preferred a broad statute, even if overinclusion might result.

*Id.* at 399. Other decisions have adopted a similarly broad construction of civil RICO. *See id.* at 388 (decisions rejecting limitations); *Sutliff, Inc. v. Donovan Companies, Inc.,* 727 F.2d 648 (7th Cir.1984).

Other courts have concluded that the statute should be construed as imposing some limitations beyond those explicitly stated. The most widely accepted limitation on the scope of civil RICO is a "standing" requirement that is inferred from the "by reason of" language of § 1964(c). One version of this requirement has been recently adopted by the Second Circuit. *See Sedima, S.P.R.L. v. Imrex, Co., Inc.,* 741 F.2d 482 (2d Cir.1984) (*Sedima*), cert. granted, —— U.S. ——, 105 S.Ct. 901, 83 L.Ed.2d 917 (1985). By this view, in order to have standing under the act, a plaintiff must allege an injury caused by activity that the statute was designed to deter, which is not simply the injury caused by the predicate acts. "RICO was not enacted merely because criminals break laws, but

because mobsters, either through the infiltration of legitimate enterprises or through the activities of illegitimate enterprises, cause systemic harm to competition and the market, and thereby injure investors and competitors.... It is only when injury caused by this kind of harm can be shown, therefore, that we believe that Congress intended that standing to sue civilly should be granted." *Id.* at 495–96. Some district courts have followed this formulation of the standing requirement. *See, e.g., Atlantic Federal Savings & Loan Ass'n v. Dade Savings & Loan Ass'n,* 592 F.Supp. 1089, 1092–93 (S.D.Fla.1984).

Another Second Circuit case has elaborated upon *Sedima*'s standing limitation. *See Bankers Trust Co. v. Rhoades,* 741 F.2d 511 (2d Cir.1984). This decision follows *Sedima*'s holding that a plaintiff "must allege a proprietary injury caused by a RICO violation, not just one caused by some of the essential elements of a RICO violation." *Id.* at 516. But it goes on to conclude that each element of § 1962 must be a "but for" cause of the injury. *Id.* at 517. The opinion then provides several examples of circumstances in which the injury is attributable to a pattern and not to the individual predicate acts:

> For example, a plaintiff who is victimized by a defendant enterprise's multiple acts of arson may thereafter be denied fire insurance as a result of his fire history; such a plaintiff whose property subsequently suffers innocent fire damage would be unable to obtain reimbursement for the damage, and his monetary loss would be the result of the pattern of predicate acts of the enterprise, rather than any of the individual acts. Or, a plaintiff might be forced to incur an unwanted debt or to take on an unwanted business partner because an enterprise has placed his business in jeopardy by using felonious means to cause a number of his customers to withhold their custom. In each instance, the plaintiff would have suffered an injury to his

business or property by reason of the defendants' use of a RICO enterprise and a pattern of racketeering acts; the individual racketeering acts, however, could not be said to have caused the same injury.

*Id.*

The Eighth Circuit has adopted a less restrictive standing requirement than the Second Circuit's *Sedima* holding. *See Alexander Grant & Co. v. Tiffany, Ind., Inc.,* 742 F.2d 408 (8th Cir.1984). "[C]ivil RICO plaintiffs [must] allege something more than injury from the underlying predicate acts." *Id.* at 413. That holding does not require however that the "injury result from mobster activity or the efforts of organized crime" as is the case with the Second Circuit's limitation. *Id.*

The Second Circuit has also imposed another limitation to be used in identifying defendants who may be sued under civil RICO. *See Sedima,* 741 F.2d at 496. Interpreting the term "violation," the court found that a plaintiff may file an action against a defendant only after the defendant has been convicted in a criminal case for the underlying predicate offenses. Thus, a civil RICO case may only follow a government prosecution of the defendant which has resulted in a conviction. Commentators and courts have severely criticized this criminal conviction requirement. *See, e.g., Harco, Inc.,* 747 F.2d at 384.

The Seventh Circuit has dismissed a civil RICO action against an accounting firm on the basis of an infiltration requirement. *See Cenco, Inc. v. Seidman & Seidman,* 686 F.2d 449, 457 (7th Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982). The court found that no legitimate purpose would be served by awarding RICO damages to those who have suffered indirectly from a violation of the statute, whose primary purpose is to cope with the infiltration of legitimate business enterprises. The scope of this requirement should be read, however, in light of the recent decision in *Sutliff, Inc. v. Donovan Companies, Inc.,* 727 F.2d 648 (7th Cir.1984).

Some courts have used Rule 9(b), of the Federal Rules of Civil Procedure, to limit civil RICO allegations. *See Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 19 (2d Cir. 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). This rule establishes a strict pleading requirement in the context of fraud allegations. These courts reason that the need for particularity of pleading is increased because of the "in terrorem" effect that is associated with charges of racketeering activity.

Recently, courts in this district have split on the proper scope of civil RICO. One decision required that the plaintiff show that the defendants are somehow connected with organized crime to determine whether a claim is within the spirit of civil RICO. *See Aliberti v. E.F. Hutton & Co., Inc.*, 591 F.Supp. 632 (D.Mass.1984). *But see Owl Construction Co., Inc. v. Ronald Adams Contractor, Inc.*, 727 F.2d 540 (5th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 118, 83 L.Ed.2d 61 (1984). Another decision in this district has rejected the Second and Eighth Circuit standing limitations and the criminal conviction requirement. *See Grado v. Gross*, CA 84–1087–MA (D.Mass. Aug. 20, 1984).

For reasons stated below, I need not and do not attempt to resolve conflicts among the various ways of formulating limitations of the scope of liability. Rather, I consider only the more basic conflict with respect to the general scope of civil RICO remedies.

### III.

The central question presented here is whether Congress, in defining "racketeering" and "pattern of racketeering activity" in the way it did, manifested an intent that these concepts not be limited on any grounds beyond those stated in the text of 18 U.S.C. § 1961 (1982).

It has been reasoned that a literal reading of the text of the statute supports the answer that the only limitations are those explicitly stated in the statutory definitions. *See Harco, Inc.*, 747 F.2d at 387, 398–99; Note, *Civil RICO: The Temptation and Impropriety of Judicial Restriction*, 95 Harv.L.Rev. 1101 (1982). That view, however, fails to take due account of the fact that Congress used "racketeering" repeatedly in the text of the statute rather than using "X" or some other neutral concept that would have carried no hint of statutory objectives and would have focused attention more sharply, if not exclusively, on the statutory definition of "X." To read the statute as if "X" were substituted wherever "racketeering" appears in the text is to disregard a compelling manifestation of congressional purpose.

Words are vehicles for expression of ideas. Some words are more precise than others, but all are to some degree imprecise and imperfect expressions of meaning. The full meaning is understood only with awareness also of context and connotation. Both the user of words and one reading or hearing them, if the two are communicating and understanding well, are aware of context and of connotations of ordinary usage. Taking account of these inherent characteristics of communication, abjuring legalistic canons of interpretation that are readily available in contradictory pairs, and applying reason and common sense to the task of determining what the text of the statute says about the issue now under consideration, we must pay attention not only to the words used in defining key concepts of the statute—including "racketeering" and "pattern of racketeering activity"—but also to the words used in labeling those concepts. The necessity of doing so, if we are truly searching for manifested meaning, is underscored by the fact that the labels are used over and over in the text of the statute, in committee and floor debate, in communications among legislators and staff, and elsewhere throughout the legislative history to which courts also turn for aid in understanding statutory meaning.

In the present case, to disregard the connotations of "racketeering" in ordinary us-

age would be to treat this legislation as meant to be misleading—perhaps even deceptive. It would be to treat it as having a sweep reaching into human affairs almost as extensively as the concept of common law fraud, but flying the strikingly narrower banner of an attack merely upon racketeering and racketeers. Courts would manifest disrespect for Congress and disregard for manifested congressional mandate were they to approach the task of construing this statute as if the congressional choice of the term "racketeering" to identify the central concept of the statute were to be disregarded entirely.

■■■ I conclude that, in enacting the "Racketeering Influenced and Corrupt Organizations Act" and its civil remedy provisions, Congress manifested an intent that these remedies be available only in relation to activities having some association with "racketeering" as that term is used in ordinary discourse. The precise characteristics of that association were not defined by the statute. Just as Congress left to the Supreme Court the authority and responsibility for defining more precisely the meaning of "restraint of trade," 15 U.S.C. § 1 (1982), in the RICO act Congress has left to the Supreme Court the authority and responsibility for defining more precisely the kind of association with "racketeering" activity that is a prerequisite to a RICO civil remedy.

### IV.

The submissions before me allude to legislative history through the citation of various judicial interpretations of congressional intent. Plaintiffs have done so chiefly to show that no limitations other than those explicitly stated in the text of the act were intended. Defendants have done so chiefly to show that intended purpose and limitations of the statute not expressed in the text of the act were made apparent in legislative hearings and debates. Even on this field of battle, victory would likely be awarded to defendants, on the ground that legislative history on RICO reveals allusions to expressed or assumed limitations on civil remedies that would be inconsistent with reading the act so as to encompass most occurrences of fraud in commercial transactions during which negotiations have included communication by mail. These arguments and responses, however, miss the central point of Part III of this Opinion, and I do not examine them in detail. More to the point is an easily established proposition: The legislative history, like the text of the statute, is rich with references to "racketeering" and "pattern of racketeering activity." As in the context of the statutory text, these references in the legislative history invoke all the connotations of "racketeering" in ordinary usage as part of the manifestation of intended meaning. Thus, legislative history, even if not read as supporting limitations not derived from the text of the statute, at least does not manifest an intent contrary to limitations implicit in the text—including limitations implicit in the congressional choice to enact a statute explicitly aimed at doing something about racketeer influenced and corrupt organizations, and not generally about fraud, or even mail fraud.

### V.

Turning to the particulars of this case as disclosed in the complaint and supplemented by other submissions of the plaintiffs, I conclude that limitations necessarily connoted by the concept of "racketeering" as a key indication of the scope of the legislation demonstrate that no valid RICO claim is stated in this complaint.

The following excerpts from the plaintiffs' complaint state their civil RICO claim:

COUNT V—LIMITED PARTNERS CLAIM FOR RACKETEERING ACTIVITIES

74. [Reincorporation of the previous paragraphs of the complaint]

75. The Partnership is an enterprise engaged in, or the activities of which affect, interstate commerce.

76. The General Partners conducted and participated, directly and indirectly, in the conduct of Partnership affairs and conspired to conduct and participate, directly and indirectly, in the conduct of Partnership affairs through a pattern of racketeering activities, including but not limited to the fraudulent acts and practices alleged in paragraph 65, above [allegations relating to acquisition of mortgage, concealment of the transaction, and conduct amounting to misrepresentations to the limited partners].

77. The said pattern of racketeering activities included numerous acts which are indictable as mail fraud under 18 U.S.C. § 1341 inasmuch as the fraudulent misrepresentations and concealments alleged in paragraph 65(c)(1) through (iv), above, were sent or delivered by the Postal Service.

78. The acts of the General Partners set forth above constitute violations of 18 U.S.C. § 1962(c) and (d) and caused the Limited Partners injury in their business or property in the amount of lost profits earned or to be earned on payoff or sale of the Mortgage.

Plaintiffs' Complaint at 21–22 (Oct. 31, 1984). The partnership claim for racketeering damages simply incorporates the above quoted paragraphs. *See id.* at Count IX.

The above quoted provisions of the complaint are based solely upon the predicate acts of mail fraud. The acts of misrepresentation all related to the purchase of the mortgage.

■ I conclude that the connotations of a "pattern of racketeering activity," as that phrase is used in the RICO statute, are not satisfied by proof that, in effectuating the purchase of a single mortgage, the defendants committed two or more predicate acts of mail fraud. To construe the statute as applying in these circumstances would be to give it a sweep so broad as to be inconsistent with manifested congressional objectives. Most substantial business trans-

actions involve two or more uses of the mail during negotiations. To hold that two such uses of the mail, in circumstances otherwise satisfying the prerequisites of proof of an offense under the mail fraud statute, are sufficient to constitute a "pattern of racketeering activity" would be to sweep into federal courts, under RICO, the great majority of actions for fraud in commercial transactions. I conclude that the Supreme Court will not read the RICO statute this broadly, whatever may be the precise terms of the limiting formulation it fashions.

A second independent ground for holding that the complaint in this case fails to state a viable claim under RICO is that some form of limitation based upon a causal connection or relationship between racketeering and plaintiffs' alleged harm is implicit in the statute. Whether a limitation should be reasoned on grounds of "standing," or "causation," or some other basis, may be quite debatable. The prediction that some limitations will be fashioned by the Supreme Court in construing and applying the act is nevertheless secure. If those limitations are reasoned on grounds of standing requirements such as have been articulated in the Second and Eighth Circuit decisions, the complaint in this case should be held insufficient on that ground. In challenging this conclusion, plaintiffs state:

The Gravamen of the RICO claims (Count V and IX) is that the General Partners participated in the affairs of the Partnership through a pattern of racketeering activities. The injury flowing from that activity was the diversion from the Partnership (not the Limited Partners personally) of a major Partnership opportunity. The predicate acts of fraud were employed to conceal from the Limited Partners the prior fraud perpetrated on the Partnership and to discourage or thrwart the Limited Partners from asserting their claim for relief. Therefore, the injury arising from the predicate acts is separate and distinct from the injury

caused by the pattern of racketeering activities.

Plaintiffs' Memorandum in Support of Jurisdiction at 14–15 (Nov. 27, 1984). They appear to argue that two types of injury have occurred: first, the injury to the partnership for loss of partnership opportunity (including injury for loss of the best sales price for the partnership property) and, second, an indirect injury to the partners. The first of these types of injury is alleged to have occurred before the two predicate acts that, according to their contention, constitute the alleged pattern of racketeering activity. I conclude that neither the first nor the second of these injuries meets the injury requirements as formulated by the Second and Eighth Circuits. Nor does the sum of the two types of injury do so. The plaintiffs' formulation as to the kind of injury required would be satisfied whenever an entity exists for the benefit of its shareholders or its partners. In this case the pattern of misrepresentations does not create injuries beyond the act of denying the limited partners the mortgage—"profits earned or to be earned on payoff or sale of the Mortgage." This case also does not involve infiltration or organized crime. This is no more than an alleged case of common law fraud and breach of fiduciary duty of the general partners to the limited partners. I conclude that Congress did not intend to give federal courts jurisdiction in such cases. This would so radically alter the federal-state balance that it is not a credible assertion that Congress would have enacted such a mandate in any form other than a very explicit statement of that intent.

The defendants' motion to dismiss will be granted. The plaintiffs' motion for reconsideration of the denial of the preliminary injunction will be denied. Likewise, the plaintiffs' motion to amend their complaint will be denied. The civil RICO count will be dismissed. The pendent state claims will be dismissed without prejudice. In light of these rulings, the plaintiffs' claims against Fleet National Bank will be dismissed for lack of jurisdiction.