John G. PURVIS and Emma
Jo Bartlett, Plaintiffs,

v.

Paul R. HAMWI, Robert W. Beckett, Sr.,
and Paul M. Serio, Defendants.

Civ. A. No. 93–F–701.

United States District Court,
D. Colorado.

Aug. 9, 1993.

**1480**

John G. Salmon, Salmon, Godsman & Nicholson, P.C., Englewood, CO, Charles F. McCloskey, Jr., Denver, CO, for plaintiffs.

Christopher C. Cross, Cross, Schlie & Heckenbach, P.C., Englewood, CO, for defendant Hamwi.

## ORDER REGARDING MOTION FOR SUMMARY JUDGMENT

SHERMAN G. FINESILVER, Chief Judge.

This is a case involving allegations of malicious prosecution. This matter comes before the Court on Defendant Paul R. Hamwi's ("Hamwi") motion to dismiss. The motion contained matters outside the pleadings; pursuant to Fed.R.Civ.P. 12(c), the motion was converted to one for summary judgment. Jurisdiction is based on 28 U.S.C. § 1332 (West Supp.1992). The parties have fully briefed the issues. For the reasons stated below, the motion is granted in part.

## I. Background

The Plaintiffs, John Purvis and Emma Jo Bartlett, claim that in 1983, Defendant Hamwi arranged for Defendants Robert W. Beckett Sr. and Paul M. Serio to murder Hamwi's ex-wife, Susan Hamwi.[1] Plaintiffs claim Defendants' purpose was to enable Hamwi to avoid paying a divorce judgment for alimony and child support for their one-and-a-half-year-old daughter, Shane. Conferences among the defendants to plan the murder allegedly took place in Pitkin County, Colorado and by telephone between Colorado and California. Hamwi paid Beckett and Serio $14,000 to go to Fort Lauderdale, Florida, where Susan Hamwi lived with Shane, and to murder Susan Hamwi. Hamwi told Beckett and Serio to make sure the murder did not look like a "professional hit."

In October 1983 Beckett and Serio flew to Fort Lauderdale, Florida. On November 1, 1983, Beckett and Serio went to Susan Hamwi's home and murdered her. In the course of the murder, Beckett and Serio sexually assaulted, strangled, and stabbed Susan Hamwi. Prior to the murder, Hamwi had told Beckett to call him after killing Susan Hamwi so that Hamwi could phone Susan Hamwi's home and, when no one answered, contact someone to go to Susan Hamwi's house, discover the body, and tend to Shane. After the murder, Beckett did call Hamwi, but Hamwi did nothing. As a result, Susan Hamwi's body was not discovered for several days and Shane died of dehydration.

At the time Susan Hamwi was murdered, Plaintiff John G. Purvis lived with his mother, Plaintiff Emma Jo Bartlett, in the same Fort Lauderdale neighborhood as Susan Hamwi. Purvis was arrested for, tried, and convicted for the murder and sexual assault of Susan Hamwi and the murder of Shane Hamwi. Hamwi cooperated with the Florida

---

1. The factual recitations contained in this order are alleged by Plaintiffs Purvis and Bartlett and denied by Defendant Paul Hamwi.

police in its investigation of Purvis, made several trips to Florida to participate in the criminal proceedings, and ultimately testified at Purvis' trial as a witness for the state of Florida. During his deposition, Hamwi responded to questioning about his financial motivation to see Susan Hamwi dead by stating to the defense counsel, "I had been making payments both to Susan and to Shane up until the time your client killed them." Plaintiffs also state Hamwi repeatedly referred to Purvis as "the guilty party."[2] According to Plaintiffs, John Purvis spent nine years in prison for the crimes of the defendants.

On December 14, 1992, Beckett confessed that he and Serio had murdered Susan Hamwi at the direction of Paul Hamwi. In January 1993, Hamwi and Serio were arrested for the murders and Purvis was released from prison. The State of Florida gave Beckett immunity from prosecution on criminal charges in exchange for his cooperation in the prosecution of Hamwi and Serio, who are both in jail in Broward County, Florida, awaiting trial for the murders of Susan and Shane Hamwi. On March 30, 1993, Purvis and Bartlett filed this civil action for damages suffered due to the acts of the defendants, including claims for (1) negligence, (2) negligent infliction of emotional distress, (3) intentional infliction of emotional distress, (4) malicious prosecution, (5) exemplary damages, (6) racketeering under the Racketeer Influenced and Corrupt Organizations Act ("RICO"); and (7) racketeering under the Colorado Organized Crime Control Act ("COCCA").

Hamwi filed a motion to dismiss the complaint, arguing that Plaintiffs' negligence claim must fail because Hamwi had no duty to come forward and admit his guilt. Hamwi concludes that the first five claims must also be dismissed for this reason, that the RICO and COCCA claims lack criteria necessary to establishing a "pattern of racketeering activity," and indispensable parties have not been joined.

## II. Summary Judgment Standard

Granting summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Ash Creek Mining Co. v. Lujan,* 934 F.2d 240, 242 (10th Cir.1991); *Metz v. United States,* 933 F.2d 802, 804 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 416, 116 L.Ed.2d 436 (1991); *Continental Casualty Co. v. P.D.C., Inc.,* 931 F.2d 1429, 1430 (10th Cir.1991). A genuine issue of material fact exists only where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Merrick v. Northern Natural Gas Co.,* 911 F.2d 426, 429 (10th Cir.1990). Only disputes over facts that might affect the outcome of the case will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Allen v. Dayco Prods., Inc.,* 758 F.Supp. 630, 631 (D.Colo.1990).

In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the party opposing the motion. *Newport Steel Corp. v. Thompson,* 757 F.Supp. 1152, 1155 (D.Colo.1990). All doubts must be resolved in favor of the existence of triable issues of fact. *Boren v. Southwestern Bell Tel. Co.,* 933 F.2d 891, 892 (10th Cir.1991); *Mountain Fuel Supply v. Reliance Ins. Co.,* 933 F.2d 882, 889 (10th Cir.1991).

In a motion for summary judgment, the moving party's initial burden is slight. In *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986), the Supreme Court held that the language of rule 56(c) does not require the moving party to show an absence of issues of material fact in order to be awarded summary judgment. Rule 56 does not require the movant to negate the opponent's claim. *Id.* at 323, 106 S.Ct. at 2552. The moving party must allege an absence of evidence to support the opposing party's case and identify supporting portions of the record. *Id.*

---

**2.** Plaintiffs regrettably do not indicate where such statements lie in the record, but we assume them to be true for purposes of this motion.

Once the movant has made an initial showing, the burden of going forward shifts to the opposing party. The nonmovant must establish that there are issues of material fact to be determined. *Id.* at 322–23, 106 S.Ct. at 2551–52. The nonmovant must go beyond the pleadings and designate specific facts showing genuine issues for trial on every element challenged by the motion. *Tillett v. Lujan*, 931 F.2d 636, 639 (10th Cir.1991). Conclusory allegations will not establish issues of fact sufficient to defeat summary judgment. *McVay v. Western Plains Serv. Corp.*, 823 F.2d 1395, 1398 (10th Cir.1987).

In reviewing the evidence submitted, the court should grant summary judgment only when there is clearly no issue of material fact remaining. In *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11, the Court held that summary judgment should be granted if the pretrial evidence is merely colorable or is not significantly probative. In *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Court held that summary judgment is appropriate when the trial judge can conclude that no reasonable trier of fact could find for the nonmovant on the basis of evidence presented in the motion and the response. *Id.* at 587, 106 S.Ct. at 1356.

### III. Analysis

#### A. *Malicious Prosecution Generally*

In order to establish a claim for malicious prosecution, a plaintiff must prove by a preponderance of the evidence that (1) the defendant was a party to or assisted in a criminal or civil proceeding against the plaintiff, (2) the proceeding was resolved in favor of the plaintiff, (3) there was no probable cause for the proceeding, (4) the defendant was motivated by malice in instituting the proceedings, and (5) the plaintiff was damaged as a result. *See Walford v. Blinder, Robinson & Co., Inc.*, 793 P.2d 620, 623 (Colo.App.1990); *see also* RESTATEMENT, SECOND, TORTS, § 653 (elements of malicious prosecution include initiation or procurement of proceedings without probable cause for a purpose other than that of bringing alleged offender to justice, and termination of proceedings in favor of accused). Actions for malicious prosecution are generally not favored in the law; this is so because public policy encourages that criminals be brought to justice and citizens be allowed to aid the prosecution without fear of civil suits for damages. *Whittaker v. Duke*, 473 F.Supp. 908, 912 (S.D.N.Y.1979), *citing Seidel v. Greenberg*, 108 N.J.Super. 248, 260 A.2d 863, 868 (Law Div.1969); *Devlin v. Greiner*, 147 N.J.Super. 446, 371 A.2d 380, 394 (Law Div. 1977).

Some clarification of the standard may be helpful. First, the level of the defendant's involvement in the alleged malicious prosecution may be analyzed by asking whether the wrongful and intentional acts of the defendants were a proximate and efficient cause of the prosecution of the plaintiff. *See Seidel v. Greenberg*, 108 N.J.Super. 248, 260 A.2d 863, 868 (1969) (noting that "[t]he fundamental and underlying basis for liability for malicious prosecution is stated in many cases and in secondary authorities in the language of proximate causation"); 52 AM.JUR.2d, Malicious Prosecution, § 25. In other words, the plaintiff must show that the defendant was "affirmatively active in instigating or participating in the prosecution." *Id.* at § 24. However, in general, while a person who takes an active part in continuing criminal proceedings initiated by himself or another is subject to the same liability for malicious prosecution as if he had actually initiated the proceedings, RESTATEMENT, SECOND, TORTS, § 655, an action for malicious prosecution will not lie against a person who, without having instituted the prior proceedings or caused them to be instituted, gave testimony against the accused as an involuntary witness for the prosecution. 52 AM.JUR.2d, Malicious Prosecution, § 28.

Second, while malicious prosecution actions generally will not lie unless the underlying criminal action was terminated in the plaintiff's favor, *see Land v. Hill*, 644 P.2d 43, 45 (Colo.App.1981), the rule must be set aside where a defendant in a malicious prosecution action was so successful in his artifice that the plaintiff was actually wrongfully convicted. *See generally* 52 AM.JUR.2d, Malicious Prosecution, § 29 (observing that prior verdict against plaintiff in malicious prosecution action is conclusive of probable cause for

prosecution, "unless it is shown to have been procured by fraud"); RESTATEMENT, SECOND, TORTS, § 667 (same). Third, malice may be shown by evidence of any motive other than to bring an offender to justice. *Suchey v. Stiles,* 155 Colo. 363, 394 P.2d 739, 741 (1964). Malice may also be inferred from a lack of probable cause in the bringing of the underlying action. *Konas v. Red Owl Stores, Inc.,* 158 Colo. 29, 404 P.2d 546, 547 (1965).

## B. Duty in Intentional Torts

Hamwi argues that because he cannot be held to have had a "duty" to incriminate himself by "com[ing] forward to prevent the prosecution of Plaintiff Purvis," Plaintiffs cannot bring a malicious prosecution action which would effectively penalize him for failing to do so.[3] Def.Mot. to Dismiss, at 2. Hamwi appears to contest only the first criterion for a claim of malicious prosecution, that is, whether he was a party to or assisted in the criminal proceeding against Purvis which resulted in Purvis' nine-year tenure in prison, or, stated otherwise, whether he had a duty to Purvis. Hamwi therefore appears to stake his defense on the dictum that an act which is in itself lawful (here, the right not to self-incriminate) does not become actionable merely because of the motive with which it is done (here, a motive to deceive or harm another). *See, e.g.,* 74 AM.JUR.2d, Torts, § 6. We disagree with both Hamwi's analysis and his result.[4] We first address whether a showing of duty is even required, and then analyze whether a duty could nevertheless be made out.

### 1. Requirement of Duty

▇▇ Vague and generalized rhetoric could be invoked on both sides of the issue of whether Hamwi owed Purvis a duty. It has been said that "[a]n act causing damage to another does not create liability where the person doing the act has a legal excuse or justification therefor." 74 AM.JUR.2d, Torts, § 43. On the other hand, "justification for an act causing loss or damage to another must be as broad as the act, and must cover not only the motive and the purpose, but also the means used." *Id.* More concretely, the Restatement of Torts, Second defines "duty" as a word "used most frequently in that part of the Restatement of [torts] which deals with the subject of Negligence." RESTATEMENT, SECOND, TORTS, § 4, comment b. " 'Duty' is rarely used in dealing with the invasions of legally protected interests by acts which are *intended* to invade them ... [I]t is [also] not, and cannot be, used in dealing with the liability which is the legal consequence of conduct which is at the peril of the actor." *Id.* (emphasis added). In cases of abnormally dangerous activities, for example, "the words 'without fault' preclude the idea that the conduct is a breach of a duty to refrain from it. In a word, there is liability without breach of any antecedent duty." *Id.*

Plaintiffs' claims of intentional infliction of emotional distress and malicious prosecution are intentional torts. It is no accident that while a cause of action in negligence contains the express elements of duty, breach, causation, proximate cause, and damages, the element of duty is present in neither of the intentional torts at issue here. *See, e.g., Walford,* 793 P.2d at 623 (standard for malicious prosecution); *Rugg v. McCarty,* 476 P.2d 753, 756 (Colo.1970) (adopting the standard for intentional or reckless infliction of emotional distress embodied in RESTATEMENT, SECOND, TORTS, § 46).

Contrary to Hamwi's declaration, a finding of duty is necessary only for Plaintiffs' two claims in negligence; his claims for intentional torts require no traditional finding of duty to Purvis because the acts alleged were intentional. Indeed, it would be anomalous to invoke a lack of a specific duty in dismissing a complaint for an intentional act, such as assault or battery. The duty, if it must be so named, is obviously to refrain from intentional harm to others. At the level of intent,

---

3. We note that neither party provided any definition of the malicious prosecution cause of action or an analysis of the facts of this case in terms of the legal standard.

4. Because the parties, inexplicably, made no attempt to adequately brief these admittedly novel and ambiguous issues, we embark on an analysis which is primarily the product of the Court's own research.

reference to duty becomes a needlessly academic and didactic exercise.

### 2. Showing of Duty

■ Hamwi's own view of what his duty is alleged to have been is the starting point of his divergence with both Plaintiffs and the Court.[5] Hamwi's analysis of what his "duty" would consist of is simply misguided. It is true that at least one district and appellate court faced with the issue have said that the actual wrongdoer has no duty "to come forward and [either] admit his guilt or face civil tort liability." *Diminnie v. United States,* 522 F.Supp. 1192, 1195 (E.D.Mich.1981), *aff'd,* 728 F.2d 301 (6 Cir.1984). To find a duty in such an instance, the courts in *Diminnie* concluded, would be tantamount to penalizing an individual for exercising his Fifth Amendment right not to incriminate himself. 522 F.Supp. at 1195; 728 F.2d at 307. The most obvious factor distinguishing *Diminnie* is that the wrongdoer there did not actually participate in the investigation or trial of the accused. His lack of participation made the case easier than the one before us.

We first note that Hamwi did not exercise his Fifth Amendment right when he was deposed or when he testified at Purvis' trial. Hamwi took the stand. Hamwi therefore appears to equate the combination of his initial voluntary, unconditional testimony, followed by his current defense under the Fifth Amendment, with something that did not occur: an invocation of his right against self-incrimination *prior to or at trial.* We are aware that such an action would have caused some suspicion against Hamwi prior to Purvis' trial, but contrary to what Hamwi urges, such a time would have been the only reasonable time he could both invoke his Fifth Amendment right and avoid intentionally and grievously harming Purvis. It was possible to do both and *Diminnie* says nothing to the

contrary. The fact is Hamwi still would have been protected by his Fifth Amendment right and yet the case against Purvis would have been appropriately weakened by a reasonable doubt. Instead of invoking his right against self-incrimination and refusing to testify, Hamwi testified.[6] We are not unmindful of the *Diminnie* Court's view on the question of duty in light of the Fifth Amendment. Although we have our doubts about the Court's holding that a tortfeasor has no duty to a *private* individual because of a contrary right maintainable only against the *State,* we can rule on more immediate grounds. The question before us is whether the facts before us make out a showing of duty (for the claims in negligence) and proximate cause (for both the claims in negligence and for the intentional torts).

We point out initially that there is a general duty to refrain from causing harm to others. *See* 74 Am.Jur.2d, Torts. § 10. Plaintiffs have a persuasive argument that public policy and fundamental notions of fairness justify imposing a duty upon a person guilty of a crime who participates in the prosecution of an innocent man. Where the innocent man would have no other remedy against the wrongs committed against him, a court might justifiably impose a duty even in the face of the witness' Fifth Amendment privilege—which, as we have noted, could be said to apply only as against the power of the State and was not invoked at the relevant time in the first place—not to incriminate himself. Otherwise, the wrongdoer could go free despite his wrongs and despite the fact that the rock and hard place in which he finds himself—of incrimination versus civil liability—is a place of his own voluntary creation. We can define the duty even more narrowly, however, and remain on firmer ground.

---

**5.** Part of the disagreement may be due to the unnecessary narrowness of Plaintiffs' pleading of the cause of action in their complaint. While the facts establish that Hamwi did more than simply fail to come forward with his alleged guilt, Plaintiffs' negligence claim states merely that Hamwi had a duty "to prevent the prosecution of Plaintiff Purvis, an innocent party, by admitting to Plaintiffs or to law enforcement authorities their complicity in the murder[s]." In their response

to Hamwi's motion to dismiss, however, Plaintiffs have offered more in the way of Hamwi's duty and we decline to dismiss their claims on the facts as presented.

**6.** The parties have not addressed the question of whether Hamwi, by his testimony, waived his Fifth Amendment rights.

Briefly stated, the right to remain silent, or not to be penalized for speaking, is qualitatively different from the right to speak affirmatively yet falsely. Hamwi was no innocent bystander or passive participant in Purvis' conviction; he did not merely fail to come forward. On the contrary, Hamwi not only committed the underlying crime, but cooperated with the Florida police in its investigation of Purvis, made several trips to Florida to participate in the criminal proceedings, and ultimately testified at Purvis' trial as a witness for the state of Florida. Most crucially, Hamwi, during his deposition, left the arena of mere cooperation and responded to a lengthy line of questioning probing his financial motivation to see Susan Hamwi dead by stating to the defense counsel, "I had been making payments both to Susan and to Shane up until the time your client killed them." *See* Dep. of Paul Roberts Hamwi, May 11, 1984, Exh. D of Plaint. Resp., at 83, lines 23–24. Hamwi's claim that he "did not give false testimony" is therefore a disputed issue of material fact. As a result of Hamwi's alleged assistance to the prosecution, Purvis was convicted and spent nine years in prison. While malicious prosecution will typically not lie where a defendant has merely falsely testified rather than "insisting upon or urging further prosecution," Restatement, Second, Torts, § 655, Comment c, the facts alleged in this case, like the facts in *Seidel* and *Devlin,* are extraordinary. There is surely a duty on the part of a knowingly guilty party not to actively facilitate the conviction and imprisonment of an innocent man. There is also a duty not to lie under oath.

### 3. Proximate Cause

 Hamwi's actions also provide us with a showing of proximate cause. Hamwi was clearly the but-for cause of Purvis' conviction and imprisonment. Without Hamwi's commission of the crime and his active aid to the prosecution as if he were an innocent witness, Purvis would not have spent a good portion of his life behind bars. *Cf. Diminnie,* 728 F.2d at 307 (finding no liability on part of government agent who committed underlying crime, but played no part in trial and confessed prior to sentencing of innocent defendant).

Our holding is consistent with the only other decision we are able to find on the subject. In *Seidel,* the defendants, owners of a building destroyed by arson, had conspired to commit the crime of arson and yet had allowed an innocent employee of the destroyed business to be publicly humiliated by a charge of arson in the newspapers. The Court, citing the development of, and necessity of fairness in, tort law, reasoned that the defendants had a duty to the plaintiff because it was "perfectly obvious that if defendants had not caused the buildings to be burned, plaintiff would never have been prosecuted for such burning." *Id.* 260 A.2d at 868. The Court, citing substantial authority, also reasoned that the greater the intent involved in the commission of the crime, and the more aggravated the circumstances, the less stringent are the requirements of foreseeability and proximate cause. *Id.* at 871 *and authorities cited therein.* In an extension of our own holding, then, the Court found a duty where the defendants involved had merely committed the underlying crime of intent and failed to come forward to clear the plaintiff's name.[7] The Court also found that the plaintiff's prosecution for a crime he did not commit was a foreseeable result of and proximately caused by the defendants' crimes.

We therefore find that Purvis may maintain his causes of action in tort against Hamwi. Specifically, the claims regarding intentional torts—for malicious prosecution and intentional infliction of emotional distress—and negligence may go forward.

### IV. Racketeering Claims

Hamwi moves to dismiss Plaintiffs' sixth and seventh claims, under the federal and state racketeering statutes, respectively, on grounds that they fail to set forth either two racketeering acts or a pattern of racketeering or prohibited activities, as required by

---

**7.** It may be presumed, however, that the defendants' conviction subsequent to their breach of duty against the plaintiff may have served to alleviate any Fifth Amendment concerns: once convicted of the same crime, the defendants had no cause to fear self-incrimination.

the applicable statutes. Plaintiffs list several crimes or acts of racketeering in support of their claim that RICO and COCCA apply, including (1) conspiracy to murder Susan Hamwi, (2) murder of Susan Hamwi, (3) murder of Shane Hamwi, (4) assault, and (5) obstruction of justice.[8] Obstruction of justice is listed as a RICO offense at 18 U.S.C. § 1961(1)(B), which incorporates obstruction of justice under 18 U.S.C. § 1503. Section 1503 criminalizes influencing, intimidating, or impeding a court official, witness, or juror. Hamwi gives several reasons these acts do not set forth more than one racketeering act as defined by the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 and the Colorado Organized Crime Control Act ("COCCA"), C.R.S. § 18–17–103(5).

First, Hamwi contends, the murder and assault occurred at the same time and are not therefore two separate acts. Second, he argues that the obstruction of justice claims pled in the complaint do not conform to the parallel racketeering activities in RICO. For example, 18 U.S.C. § 1510 and 1511, respectively, deal with bribery to obstruct or delay and conspiracy to obstruct to facilitate gambling. Finally, Hamwi maintains that even if the obstruction claims were properly pled, he had a Fifth Amendment right not to confess or aid the investigation. After reviewing the standards for RICO and COCCA claims, we address these contentions in turn.

RICO renders criminally and civilly liable "any person" who, among other things, uses or invests income derived "from a pattern of racketeering activity" to acquire an interest in or to operate an enterprise engaged in interstate commerce. 18 U.S.C. § 1962(a). COCCA was modelled after RICO and is similar in most relevant respects. While federal cases interpreting RICO are not dispositive in interpretations of COCCA, they are instructive on similar issues. *See, e.g., People v. Chaussee,* 847 P.2d 156 (Colo.App. 1992). For example, a "pattern" of racketeering activity under COCCA requires that

the defendants "engage in at least two acts of racketeering activity which are related to the conduct of the enterprise." C.R.S. § 18–17–103(3). A "pattern" of racketeering activity under RICO "requires at least two acts of racketeering activity" within a ten-year period, 18 U.S.C. § 1961(5), but "while two acts are necessary, they may not be sufficient." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985).

■ In order to make out a pattern under RICO, the predicate acts must somehow be ordered or arranged, bearing some relationship to each other, and implicate the threat of continuing activity. *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 238–239, 109 S.Ct. 2893, 2900–2901, 106 L.Ed.2d 195 (1989). " 'It is this factor of *continuity plus relationship* which combines to produce a pattern.' " *Id.* (quoting 116 Cong.Rec. 18940 (1970) (emphasis added)). Congress' and the Supreme Court's definitions of "pattern," "relationship," and "continuity," however, are regrettably vague and provide little guidance. *See id.* at 251, 109 S.Ct. at 2906 (Scalia, J., concurring). Whether a complaint or indictment makes out a "pattern" of racketeering activity is best determined on a case by case basis and on specific facts. *Id.* at 244, 109 S.Ct. at 2903.

The first factor, relationship, is satisfied if it embraces "criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and not isolated events." 18 U.S.C. § 3575(e) (from Title X of the Dangerous Special Offender Sentencing Act, now partially repealed); *see also H.J. Inc.,* 492 U.S. at 240, 109 S.Ct. at 2901. Furthermore, multiple schemes may be sufficient to show a pattern, but are not necessary. *Id.*

" 'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the

---

**8.** Plaintiffs stated in the complaint that Hamwi had obstructed a criminal investigation and state or local law enforcement. Plaintiffs admit in their response to the motion to dismiss that they should have alleged merely "obstruction of jus-

tice" and will ask the Court for permission to amend their complaint. Because what Plaintiffs actually alleged can be fit under the broad umbrella of "obstruction of justice," we do not consider an amendment necessary.

future with the threat of repetition." *Id.* at 241, 109 S.Ct. at 2901. But predicate acts "extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct." *Id.* at 242, 109 S.Ct. at 2902. In examining continuity, courts have taken into consideration several factors, including (1) the number and variety of predicate acts, (2) the length of time during which they were committed, (3) the number of victims, (4) the occurrence of single versus multiple, distinct injuries, *Passini v. Falke–Gruppe*, 745 F.Supp. 991, 992 (S.D.N.Y.1990), and (5) whether the defendants' conduct amounted to a single scheme or several separate schemes. *Jones v. Lampe*, 845 F.2d 755, 757 (7th Cir. 1988); *R.E. Davis Chemical Corp. v. Nalco Chemical Co.*, 757 F.Supp. 1499 (N.D.Ill. 1990).

■ We do not believe the predicate acts alleged by Plaintiffs constitute "racketeering activity" as contemplated in RICO or COCCA. It is tempting to say simply that, once one applies common sense, the term "racketeering" means only certain types of crimes, namely, crimes committed by organized crime organizations—extortionate credit transactions, drug trafficking, gambling. *See, e.g., Alexander v. Thornburgh*, 713 F.Supp. 1278, 1283 (D.Minn.1989), *appeal dismissed*, 881 F.2d 1081 (1989); *Exeter Towers Associates v. Bowditch*, 604 F.Supp. 1547, 1553–54 (D.Mass.1985). However, in *H.J. Inc.*, the Supreme Court appeared to discourage such narrow constructions, noting that Congress had defined "pattern of criminal conduct" only in terms of the *relationship* between the criminal acts, thus conceiving of "pattern" as a "flexible concept" that is not so narrow as to exclude activities performed by only one person or activities without an organized crime nexus. 492 U.S. at 245–46, 109 S.Ct. at 2903–04. Instead, keeping in mind the Court's statement that predicate acts "extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement," *id.* at 242, 109 S.Ct. at 2902, and applying the five factors enumerated by district courts, we conclude that Plaintiffs' allegations do not make out a pattern of racketeering activity.

Employing the Supreme Court's limitation, we note the activities alleged here took place over a very short period of time. The murder and assault happened at the same time (and are at best duplicative claims) and the alleged obstruction of justice took place some time later but has little relation to the first acts of violence in the way elements of a racket or scheme are related; rather, while the murders, if ordered by Hamwi, served one distinct end, any obstruction of justice would have served another, namely, Hamwi's attempts to cover his tracks. In analyzing a claim under COCCA, the Colorado Court of Appeals invoked the *H.J. Inc.* Court's definition of "relationship" to conclude that perjury and forgery in discovery regarding several crimes of fraud "were neither undertaken with the same *purpose* as defendants' initial fraudulent dealership activities, nor were they undertaken with the intention of achieving the same *results*, and they employed different *methods of commission*." *Chaussee*, 847 P.2d at 161 (emphasis in original). We believe the same analysis and conclusion to be applicable here.

But we can rest our holding on the second prong of the Supreme Court's cautionary statement: there was in these acts no threat of future criminal conduct. The predicate acts alleged here are all part of the same, short-lived series of acts that revolved around the single alleged purpose of murdering Paul Hamwi's family. To pretend otherwise would be to make a full-fledged racketeer of a burglar who surprised and shot a homeowner, stole a car to make his getaway, collided with and killed a pedestrian, and obstructed justice by fleeing the jurisdiction. There must be more to a racketeering scheme than several crimes strung together by an individual; there must be some relationship, other than temporal, between the crimes, and there must be some threat that the individual will repeat those same or similar crimes in the future. *See, e.g., Passini*, 745 F.Supp. at 993 (noting plaintiff had alleged no facts tending to show that defendants made a practice of defrauding designers in order to gain control of potentially promising designs); *In Re Phillips Petroleum Securities Litigation*, 738 F.Supp. 825,

842 (D.N.J.1990) (holding that predicate acts concerning a very short period of time and threatening no repetition did not make out a pattern of racketeering activity); *Azurite Corp. v. Amster & Co.,* 730 F.Supp. 571, 581 (S.D.N.Y.1990) (holding that short-term, closed-ended scheme did not show threat of continuity absent allegations that defendants had committed the same or similar acts or had committed them again after the period at issue); *Continental Realty Corp. v. J.C. Penney, Inc.,* 729 F.Supp. 1452, 1454 (S.D.N.Y. 1990) ("[T]here is no reason to believe that Home Depot will continue to provide dummy bids for the Defendants in other real estate transactions.").

Our conclusion is buttressed by an application of the five factors. Applying the first factor, the number and variety of the predicate acts, the number of predicate acts is four and there is little variety among them. As mentioned above, two murders and an assault are alleged, but they were all part of the same violent transaction and are not easily classified as separate acts. Second, the period of time over which the first three acts took place was at most a few hours, and the alleged obstruction of justice that occurred a few months later (with no acts in between) adds little to the claim of a racketeering scheme. Third, there were three victims, a fact which does not appear to cut either way. Fourth, the injuries suffered were multiple and distinct. Finally, there was at most one scheme. On balance, and particularly due to the first, second, and fifth factors, we are further satisfied that no pattern of racketeering activity has been alleged.

## V. Failure to Join Indispensable Parties

 Hamwi argues that this action must be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(7) and 19 due to Plaintiffs' failure to join indispensable parties. Hamwi states that the court order setting aside Purvis' judgment pointed out the inappropriate actions of the State of Florida, the psychiatrist who coerced from Purvis his confession, and the police officers who assisted the psychiatrist. Hamwi states these are the true parties at fault and complete relief cannot be had without their presence in the action; therefore, Hamwi concludes, they should be dismissed.

We disagree for several reasons. First, Hamwi provides no authority for his position. Second, a motion to dismiss for failure to join an indispensable party is premature absent discovery. *See MIJE Associates v. Halliburton Services,* 552 F.Supp. 418, 419 (S.D.N.Y.1982). The point is virtually conceded by Hamwi in his reply brief, though he goes on to question why this action was filed in Colorado rather than Florida in the first place. The question of venue, however, is not before us. Third, "[a]s to defendants who acted in concert, the plaintiff may, in accordance with the general rules, sue each defendant separately, or all jointly." 52 AM. JUR.2d, Malicious Prosecution, § 112. The motion is denied.

### VI.

Accordingly, it is ordered that:

(1) Defendant Paul R. Hamwi's Motion to Dismiss, filed May 5, 1993, is converted to a motion for summary judgment and is GRANTED IN PART and DENIED IN PART.

(2) Plaintiffs' sixth and seventh claims are DISMISSED.

(3) Plaintiffs' Request for Oral Argument Re: Defendant's Motion to Dismiss, filed June 30, 1993, is DENIED.

(4) Plaintiffs' Motion for Leave to File Supplemental Brief One Day Late, filed August 6, 1993, is GRANTED. The Clerk of the Court is DIRECTED to file through Plaintiffs' Supplemental Authorities, Exhibits, and Argument.